JOSEPH M. GOETHALS (SBN 242889)
joe@gostlaw.com
CHARLES P. STONE (SBN 224897)
charles@gostlaw.com
DAVID G. HOLLENBERG (SBN 325408)
dave@gostlaw.com
**GOETHALS & STONE, PC**
330 Primrose Road, Suite 614
Burlingame, CA 94010
Telephone: (650) 218-4319
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN AA3 DOE, JOHN AC2 DOE, JOHN AM2 DOE, JOHN AT DOE, JOHN AV DOE, JOHN DD2 DOE, JOHN EC DOE, JOHN ER DOE, JOHN JA DOE, JOHN JS DOE, JOHN JS2 DOE, JOHN JT DOE, JOHN SL DOE, JOHN SR DOE, JOHN XH DOE,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN MATEO; DOE 1; DOE 2; DOE 3; DOE 4; DOE 5; DOE 6; DOE 7; DOE 8; AND DOES 9–100, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Violation of Civil Rights (42 U.S.C. § 1983 – Fourth Amendment: Unreasonable Searches)<br>2. Violation of Civil Rights (42 U.S.C. § 1983 – Fourteenth Amendment: Substantive Due Process / Bodily Integrity)<br>3. Violation of Civil Rights (42 U.S.C. § 1983 – Fourteenth Amendment: Equal Protection)<br>4. Monell Municipal Liability (42 U.S.C. § 1983 Unconstitutional Policy, Custom, Practice, and Deliberate Indifference)<br>5. Violation of the Bane Act (California Civil Code § 52.1)<br>6. Sexual Battery (Cal. Civil Code § 1708.5; Gov Code § 815.2)<br>7. Battery (Common Law; Gov. Code § 815.2)<br>8. Intentional Infliction of Emotional Distress (Gov. Code § 815.2)<br>9. Negligence (Gov. Code § 815.2)<br>10. Negligent Hiring, Supervision, and Retention<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS


**I. PRELIMINARY STATEMENT** ..... 1

**II. PARTIES** ..... 1

A. Plaintiffs ..... 1

B. Defendants ..... 5

**III. JURISDICTION, VENUE, AND JOINDER** ..... 10

**IV. PSEUDONYMOUS FILING** ..... 11

**V. TIMELINESS; STATUTES OF LIMITATION; TOLLING** ..... 13

A. The Governing Statute ..... 13

B. Plaintiffs' State Law Claims Are Timely Under § 340.11(a)(1) ..... 13

C. Section 340.11(c) Does Not Bar Plaintiffs' Claims ..... 14

D. Plaintiffs' Claims Under 42 U.S.C. § 1983 Are Timely ..... 16

E. Equitable Estoppel ..... 18

F. No Government Claim Presentation Required ..... 18

G. Compliance with Section 340.11's Certificate Requirement; Reservation ..... 18

**VI. FACTUAL ALLEGATIONS** ..... 19

A. The County's Probation Enterprise and the Authority It Conferred ..... 19

B. John Domeniconi — A Predator Enabled by County Authority ..... 20

C. The County's Actual Knowledge and Suppression of Complaints ..... 22

D. Color of Law ..... 26

E. Plaintiff-Specific Allegations ..... 26

A. JOHN AA3 DOE ..... 27

B. JOHN AC2 DOE ..... 29

C. JOHN AM2 DOE ..... 30

D. JOHN AT DOE ..... 33

E. JOHN AV DOE ..... 35

F. JOHN DD2 DOE ..... 37

G. JOHN EC DOE ..... 38

H. JOHN ER DOE .......... 40
I. JOHN JA DOE .......... 42
J. JOHN JS DOE .......... 44
K. JOHN JS2 DOE .......... 45
L. JOHN JT DOE .......... 47
M. JOHN SL DOE .......... 49
N. JOHN SR DOE .......... 50
O. JOHN XH DOE .......... 53

**VII. CAUSES OF ACTION** .......... 55

FIRST CAUSE OF ACTION: Violation of 42 U.S.C. § 1983 — Fourth Amendment (Unreasonable Searches) .......... 55
SECOND CAUSE OF ACTION: Violation of 42 U.S.C. § 1983 — Fourteenth Amendment (Substantive Due Process / Bodily Integrity) .......... 56
THIRD CAUSE OF ACTION: Violation of 42 U.S.C. § 1983 — Fourteenth Amendment (Equal Protection) .......... 57
FOURTH CAUSE OF ACTION: *Monell* Municipal Liability — 42 U.S.C. § 1983 .......... 57
Theory 1: Longstanding Custom and Practice of Deliberate Indifference .......... 58
Theory 2: Failure to Train and Supervise with Deliberate Indifference .......... 58
Theory 3: Ratification by Final Policymakers .......... 59
Theory 4: Deliberately Indifferent Policy of Inadequate Safeguards .......... 59
FIFTH CAUSE OF ACTION: Violation of the Bane Act (California Civil Code § 52.1) .......... 60
SIXTH CAUSE OF ACTION: Sexual Battery (California Civil Code § 1708.5; Government Code § 815.2) .......... 61
SEVENTH CAUSE OF ACTION: Battery (Common Law; Government Code § 815.2) .......... 61
EIGHTH CAUSE OF ACTION: Intentional Infliction of Emotional Distress (Government Code § 815.2) .......... 62

NINTH CAUSE OF ACTION: Negligence (Government Code § 815.2) .................... 62
TENTH CAUSE OF ACTION: Negligent Hiring, Supervision, and Retention ........... 63
**VIII. DAMAGES** .......... 63
**IX. PRAYER FOR RELIEF** .......... 64
**X. JURY TRIAL DEMAND** .......... 65

## I. PRELIMINARY STATEMENT

This is a civil rights action brought by fifteen survivors of childhood sexual abuse perpetrated by John Domeniconi ("Domeniconi"), a Deputy Probation Officer employed for decades by Defendant County of San Mateo ("County"). Domeniconi weaponized the extraordinary coercive power of the state — the authority to compel strip searches, administer urine tests, impose probation violations, and determine whether a child would sleep that night in a detention facility or at home — to systematically sexually abuse, assault, and terrorize vulnerable minors placed in his custody and care.

Domeniconi was not a rogue actor. He was an institutionally protected predator. The County received written reports of his abuse as early as 1990. It investigated him in 2002. When probationers filled out grievance forms, they would be thrown in a trash bin. Despite each warning sign, each complaint, each report, it promoted him and gave him more opportunities to abuse and take advantage of probationers, many of whom were not even assigned to him. The County and its employees' deliberate indifference to Domeniconi's unconstitutional conduct, and its affirmative ratification of that conduct through continued employment and promotion, transformed each individual act of abuse into an act of government.

Plaintiffs bring this action to vindicate their rights under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the laws of the State of California. They seek compensatory damages, statutory damages, treble damages, exemplary damages against the individual Defendants, and attorney's fees.

## II. PARTIES

### A. Plaintiffs

1. **Plaintiff JOHN AA3 DOE** is a male individual born in 1973, currently 53 years of age, and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1989 to 1991, during which period he was placed at Hillcrest Juvenile Hall and supervised in the community.

2. **Plaintiff JOHN AC2 DOE** is a male individual born in 1977, currently 49 years of age, and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1992 to 1994, during which period he was placed at Hillcrest Juvenile Hall, Camp Glenwood, and supervised in the community.

3. **Plaintiff JOHN AM2 DOE** is a male individual born in 1979, currently 47 years of age, and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1995 to 1997, during which period he was placed at Hillcrest Juvenile Hall and supervised in the community.

4. **Plaintiff JOHN AT DOE** is a male individual born in 1978, currently 48 years of age, and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1992 to 1996, during which period he was placed at Hillcrest Juvenile Hall, Camp Glenwood, and supervised in the community.

5. **Plaintiff JOHN AV DOE** is a male individual born in 1979, currently 47 years of age, and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. Although Plaintiff AV DOE was never on supervised probation in County of San Mateo, in or about 1993, when he was 13 years old, Domeniconi — acting under color of law, in his capacity as a Deputy Probation Officer of the County, and by means of the authority the County conferred upon him —forcibly arrested and detained him under the pretense that he would "take him to jail" if he did not comply. Domeniconi's subsequent abuse of John AV Doe was accomplished by virtue of that exercise of state authority.

6. **Plaintiff JOHN DD2 DOE** is a male individual born in 1982, currently 43 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of

childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1997 to 2000, during which period he was placed at Hillcrest Juvenile Hall, and supervised in the community.

7. **Plaintiff JOHN EC DOE** is a male individual born in 1975, currently 51 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1987 to 1993, during which period he was placed at Hillcrest Juvenile Hall, Camp Glenwood, and supervised in the community.

8. **Plaintiff JOHN ER DOE** is a male individual born in 1983, currently 43 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1995 to 2001, during which period he was placed at Hillcrest Juvenile Hall, Camp Glenwood, and supervised in the community.

9. **Plaintiff JOHN JA DOE** is a male individual born in 1982, currently 44 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1998 to 2000, during which period he was placed at Hillcrest Juvenile Hall, Camp Glenwood, and supervised in the community.

10. **Plaintiff JOHN JS DOE** is a male individual born in 1982, currently 44 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1998 to 2000, during which period he was placed at Hillcrest Juvenile Hall, and supervised in the community.

11. **Plaintiff JOHN JS2 DOE** is a male individual born in 1985, currently 41 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1995 to 2003, during which period he was placed at Hillcrest Juvenile Hall and supervised in the community.

12. **Plaintiff JOHN JT DOE** is a male individual born in 1980, currently 45 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1995 to 1997, during which period he was placed at Hillcrest Juvenile Hall and supervised in the community.

13. **Plaintiff JOHN SL DOE** is a male individual born in 1982, currently 44 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority from approximately 1994 to 1997, during which period he was placed at Hillcrest Juvenile Hall, Camp Glenwood, and supervised in the community.

14. **Plaintiff JOHN SR DOE** is a male individual born in 1978, currently 47 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory authority. He was subject to that authority in the year 1993, during which period he was placed at Hillcrest Juvenile Hall, Camp Glenwood, and supervised in the community.

15. **Plaintiff JOHN XH DOE** is a male individual born in 1976, currently 49 years of age and a resident of the State of California. He uses a pseudonym to protect his privacy as a survivor of childhood sexual assault. At all relevant times he was a juvenile probationer under the supervision of the County's Probation Department and subject to Domeniconi's direct or *de facto* supervisory

authority. He was subject to that authority from approximately 1992 to 1994, during which period he was placed at Hillcrest Juvenile Hall and supervised in the community.

16. Each Plaintiff was 40 years of age or older as of the date this Complaint is filed. Because the childhood sexual assaults alleged herein occurred before January 1, 2024, the timeliness of Plaintiffs' state law claims is governed by California Code of Civil Procedure § 340.11, enacted by Senate Bill 558 (2023) and effective January 1, 2024, and not by California Code of Civil Procedure § 340.1, which by its terms applies to childhood sexual assault occurring on and after January 1, 2024.

17. Concurrently with this Complaint, and subject to the reservation of rights set forth in Paragraph 61 below, undersigned counsel has submitted for the Court's *in camera* review, under seal, a certificate of merit executed by counsel as to each Plaintiff pursuant to California Code of Civil Procedure § 340.11(g)(1).

18. Concurrently with this Complaint, and subject to the same reservation, Plaintiffs have submitted for the Court's *in camera* review, under seal, a certificate of merit executed by a licensed mental health practitioner as to each Plaintiff pursuant to California Code of Civil Procedure § 340.11(g)(2).

19. The true names and identifying information of Plaintiffs are withheld from the public record to protect Plaintiffs' privacy as survivors of childhood sexual assault. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000). Concurrently with this Complaint, Plaintiffs will file an administrative motion under Civil Local Rule 7-11 for leave to proceed under pseudonyms, together with an administrative motion under Civil Local Rule 79-5 to file under seal a declaration of counsel disclosing each Plaintiff's true name. Plaintiffs will disclose their true identities to counsel for Defendants pursuant to a protective order.

**B. Defendants**

20. **Defendant County of San Mateo** ("County") is a public entity organized and existing under the laws of the State of California. At all relevant times, the County operated and controlled a Probation Department responsible for the supervision, custody, and care of juvenile probationers, including each of the Plaintiffs. The County is sued under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for its own unconstitutional policies, customs, practices, and deliberate

indifference, and pursuant to California Government Code § 815.2 for the acts and omissions of its employees acting within the course and scope of employment.

21. **John Domeniconi** ("Domeniconi") was at all relevant times a Deputy Probation Officer employed by the County's Probation Department. Domeniconi died on September 23, 2020. He is named herein solely to provide factual context. No claim for personal damages is asserted against his estate, and Domeniconi is not named as a defendant in this action.

22. **Defendant DOE 1** served the County of San Mateo Probation Department from 1977 to 2013 — a tenure spanning every notice event and every act of abuse alleged in this Complaint, all of which occurred between approximately 1987 and 2003. On information and belief, throughout that period and before his 2009 appointment as Chief Probation Officer, Doe 1 held supervisory positions within the Department with direct or indirect oversight of Domeniconi; the precise assignments and dates are recorded in personnel records within the County's exclusive possession and control, as alleged in Paragraph 82. On information and belief, during the period of Plaintiffs' abuse Doe 1 received or was informed of complaints concerning Domeniconi's misconduct with juvenile probationers and of the Department's failure to investigate or remediate that misconduct, and failed to take adequate remedial action, including failing to investigate, discipline, restrict, remove, or report Domeniconi, and failed to make any required mandated report under California Penal Code section 11166. In 2009, Doe 1 was appointed Chief Probation Officer, and in that capacity was a final policymaker with authority over the hiring, supervision, discipline, promotion, retention, and removal of all Probation Department personnel. Doe 1 is sued in his individual capacity.

23. **Defendant DOE 2** was at all relevant times a probation officer or supervisory employee of the County of San Mateo Probation Department. Prior to 2003, and during the period of one or more Plaintiffs' abuse, Doe 2 directly received a disclosure from at least one juvenile probationer under County supervision reporting that Domeniconi had directed sexualized comments and conduct toward him, including asking the probationer what he did when he took showers. Notwithstanding receipt of this direct complaint, Doe 2 failed to investigate, failed to report to supervisors or law enforcement, and failed to make any mandated report under California Penal Code

section 11166, thereby actively concealing Domeniconi's abuse and enabling its continuation. Doe 2 is sued in his individual capacity.

24. **Defendant DOE 3** was at all relevant times a probation officer or supervisory employee of the County of San Mateo Probation Department. Prior to 2003, and during the period of one or more Plaintiffs' abuse, Doe 3 directly received a disclosure from at least one juvenile probationer in Domeniconi's custody alleging that Domeniconi had sexually abused him. Notwithstanding receipt of this direct complaint, Doe 3 failed to investigate, failed to report to supervisors or law enforcement, and failed to make any mandated report under California Penal Code section 11166, thereby actively concealing Domeniconi's abuse and enabling its continuation. Doe 3 is sued in his individual capacity.

25. **Defendant DOE 4** served as a supervisory employee of the County of San Mateo Probation Department, ultimately holding the office of Assistant Chief Probation Officer, during a period encompassing the abuse of one or more Plaintiffs. Under the Department's own complaint-handling structure, complaints concerning probation officers were escalated to the Department's executive tier — the same tier that the County's own 1991 written records show was consulted regarding complaints against Domeniconi. On information and belief, Doe 4 received or was informed of complaints concerning Domeniconi's misconduct with juvenile probationers and failed to take adequate remedial action, including failing to investigate, discipline, remove, or report Domeniconi. Doe 4 is sued in her individual capacity.

26. **Defendant DOE 5** served as a supervisory employee of the County of San Mateo Probation Department, ultimately holding the office of Deputy Chief Probation Officer — the office to which, per the County's own 1991 written records, complaints concerning Domeniconi were routed for consultation — during a period encompassing the abuse of one or more Plaintiffs. On information and belief, Doe 5 received or was informed of complaints concerning Domeniconi's misconduct with juvenile probationers and failed to take adequate remedial action, including failing to investigate, discipline, remove, or report Domeniconi. Doe 5 is sued in his individual capacity.

27. **Defendant DOE 6** served the County of San Mateo Probation Department for over 32 years. She held supervisory positions at the County's juvenile hall beginning in November 1985, and

from September 1994 forward held institutional management authority over the County's juvenile hall and juvenile camps — the very facilities where Domeniconi abused Plaintiffs, during the very period in which written ward grievances were submitted and discarded, Domeniconi was discovered alone with a minor probationer in the minor's room, and the Sheriff's Office investigated a complaint against him. Ward grievances at those facilities were routed to facility management for review. On information and belief, Doe 6 received or was informed of complaints concerning Domeniconi's misconduct with juvenile probationers and failed to take adequate remedial action, including failing to investigate, discipline, remove, or report Domeniconi. Doe 6 is sued in her individual capacity.

28. **Defendant Doe 7** served as a supervisory employee of the County of San Mateo Probation Department, including as Probation Services Manager I and II and Assistant Deputy Chief, during a period encompassing the abuse of one or more Plaintiffs. Doe 7 has acknowledged that she was aware of a complaint involving Domeniconi at the time it occurred, in or about the year 2002. In or about 2013–2014 she directly supervised Domeniconi's direct supervisor. On information and belief, Doe 7 received or was informed of complaints concerning Domeniconi's misconduct with juvenile probationers and failed to take adequate remedial action, including failing to investigate, discipline, remove, or report Domeniconi. Doe 7 is sued in her individual capacity.

29. **Defendant Doe 8** served the County of San Mateo Probation Department beginning in October 1983, and from approximately 2000 on, served as a Probation Services Manager I — the supervisory classification directly responsible for supervising deputy probation officers — holding supervisory assignments across the Department's juvenile institutions and field services, including service as interim Director of the County's juvenile hall. From approximately 2000 through 2003 — when one or more Plaintiffs remained in County custody and under County supervision — Doe 8 held that supervisory classification and, on information and belief, received or was informed of complaints concerning Domeniconi's conduct with minors and failed to investigate, escalate, report, or restrict his access to probationers. Per the County's own designated representative, Doe 8 directly supervised Domeniconi for a period in or about 2013–2014. In or around the year 2010, Charles Etchison, the founder and director of the Jericho Project, a residential treatment program serving County of San Mateo probationers, telephoned the Probation Department to report Domeniconi's conduct:

Domeniconi had repeatedly appeared at the program; had represented himself as the current probation officer of program participants when he was not; had taken participants — his former juvenile probationers — out of the program for meals and shopping trips; and had bought them clothes, cologne, and other personal items. Etchison's call was transferred to Domeniconi's supervisor, Defendant Doe 8. Etchison told Doe 8 that "there is something definitely wrong here," that the conduct was not typical of a probation officer, and that it had to be investigated. Doe 8 responded by warning Etchison that he was making accusations that could affect someone's career and could lead to termination. Notwithstanding this direct, detailed report of grooming behavior by an officer with ongoing custodial access to minors, Doe 8 failed to investigate, failed to escalate or report the complaint to Department executives or law enforcement, and failed to take any step to restrict Domeniconi's access to probationers, thereby suppressing the complaint and enabling Domeniconi's continued abuse. Doe 8 is sued in her individual capacity.

30. **Defendants DOES 9–100** are or were, at all relevant times, employees, agents, supervisors, managers, and/or policymakers of the County who, acting within the course and scope of their employment: (a) directly participated in the deprivation of Plaintiffs' constitutional rights; (b) implemented, authorized, or ratified unconstitutional policies, customs, or practices; (c) failed to train, supervise, discipline, or remove Domeniconi despite actual or constructive knowledge of his unconstitutional and tortious conduct; and/or (d) concealed, suppressed, or failed to investigate complaints arising from Domeniconi's abuse. DOES 9–100 are sued in their individual capacities. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained through discovery. Defendants Doe 1 through Doe 8 and Does 9 through 100 are referred to collectively herein as the "Individual Defendants."

31. The conduct of the Individual Defendants alleged in Paragraphs 22 through 30 is incorporated by reference into each cause of action asserted below. Each Individual Defendant is alleged to have acted, and to have failed to act, during the period of one or more Plaintiffs' abuse, which ran from approximately 1987 through 2003.

//

//

## III. JURISDICTION, VENUE, AND JOINDER

32. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

33. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy.

34. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b), because Defendant County of San Mateo resides in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including at Hillcrest Juvenile Hall and Camp Glenwood in San Mateo County, California.

35. Intra-district assignment to the San Francisco Division is appropriate pursuant to N.D. Cal. Civil Local Rule 3-2(d), which assigns all civil actions arising in San Mateo County to either the San Francisco Division or the Oakland Division.

36. Plaintiffs are properly joined in this action under Federal Rule of Civil Procedure 20(a)(1). Plaintiffs' claims arise out of the same series of transactions and occurrences: the County's retention of a single Deputy Probation Officer in a position of unsupervised, intimate access to the juvenile male probationers committed to its custody; its receipt, from no later than 1990, of an accumulating series of written and verbal reports that he was abusing them; its suppression of those reports and its failure to investigate, discipline, restrict, or remove him; and its promotion of him notwithstanding that knowledge. Each Plaintiff was abused by the same employee, in the same County facilities, under the same custodial authority, and during an overlapping period of years, and each Plaintiff's injury is a consequence of that same institutional course of conduct. Claims arising from a systematic pattern of events satisfy the transaction-or-occurrence requirement of Rule 20. *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997); *see Mosley v. General Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) ("all logically related events entitling a person to institute a legal action" comprise a single transaction or occurrence, and joinder is proper where each plaintiff's injury

flows from a single institutional policy). Questions of law and fact common to all Plaintiffs will arise in this action, including:

a. Whether the County knew or should have known that Domeniconi posed a risk of sexual abuse to the minors committed to its custody;

b. Whether the County maintained a policy, custom, or practice of failing to investigate, document, discipline, and report complaints of sexual misconduct by probation personnel;

c. Whether the County failed to train and supervise its probation personnel with deliberate indifference to the constitutional rights of those minors;

d. Whether final policymakers for the County ratified Domeniconi's conduct;

e. Whether Domeniconi acted under color of state law and within the course and scope of his employment;

f. Whether the County concealed the reports of abuse it received, and the effect of that concealment on the running of any limitations period; and

g. Whether California Code of Civil Procedure section 340.11(c) applies to the County.

37. Joinder of Plaintiffs' claims in a single action serves the purpose of Rule 20, under which "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties." *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 558 F.2d 914, 917 (9th Cir. 1977) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966)). Trying these claims separately would require fifteen separate juries to resolve the same questions concerning the County's knowledge, policies, supervision, and records, on the same documents and the same witnesses. Should the Court later determine that separate trials are necessary to avoid prejudice to any party, Federal Rules of Civil Procedure 20(b) and 42(b) provide that remedy without severing this Complaint.

## IV. PSEUDONYMOUS FILING

38. Plaintiffs file this action under pseudonyms. Each Plaintiff is a survivor of childhood sexual abuse and faces a substantial risk of harm including stigma, re-traumatization, and interference with ongoing therapeutic treatment if their identities are publicly disclosed. The need for anonymity

substantially outweighs any public interest in disclosure. The use of pseudonyms will not prejudice Defendant County of San Mateo, a governmental entity with full access to its own Probation Department records, including records identifying the individuals associated with the reported abuse. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000). Plaintiffs will file a concurrent administrative motion for leave to proceed under pseudonyms.

39. Defendant County of San Mateo is named in the caption of this Complaint. Plaintiffs do not concede that California Code of Civil Procedure section 340.11(l) — which provides that "a defendant shall be named by 'Doe' designation in any pleadings or papers filed in the action until there has been a showing of corroborative fact as to the charging allegations against that defendant" — applies in this Court, and expressly reserve their position that Federal Rule of Civil Procedure 10(a), which requires that "[t]he title of the complaint must name all the parties," displaces it. The County has in any event waived any protection section 340.11(l) affords it and has consented to be named. Plaintiffs continue to designate Defendants Doe 1 through Doe 8 by "Doe" designation pending the showing of corroborative fact described below, and will name each of them in an amended pleading upon leave of this Court.

40. Pursuant to California Code of Civil Procedure § 340.11(m), and as to Defendants Doe 1 through Doe 8 only, Plaintiffs will concurrently file an application for leave to amend this Complaint to substitute each such Defendant's true name for the fictitious designation, as follows:

a. Plaintiffs will file a certificate of corroborative fact executed by undersigned counsel, declaring that the attorney has discovered one or more facts corroborative of the charging allegations against the defendants.

b. The application will be made before the defendant's appearance in the action, and thus may not be served on the defendant.

c. Under California Code of Civil Procedure § 340.11(n), the court shall review the application and certificate of corroborative fact *in camera*, and based solely on the certificate and any reasonable inferences to be drawn therefrom, shall, if one or more facts corroborative of one or more of the charging allegations has been

shown, order that the complaint may be amended to substitute the names of the defendants.

d. California Code of Civil Procedure § 340.11(o) requires that the court maintain under seal and confidential from the public and all parties to the litigation, other than the Plaintiffs, all certificates of corroborative fact filed pursuant to section 340.11(m). Plaintiffs will concurrently file an administrative motion to maintain all certificates of corroborative fact under seal, pursuant to Local Rule 79-5.

## V. <u>TIMELINESS; STATUTES OF LIMITATION; TOLLING</u>

### A. The Governing Statute

41. Each cause of action in this Complaint seeks recovery of damages suffered from childhood sexual assault, as defined by California Code of Civil Procedure § 340.11(d).

42. The childhood sexual assaults alleged herein occurred before January 1, 2024. The timeliness of Plaintiffs' state law claims is therefore governed by California Code of Civil Procedure § 340.11, and not by § 340.1, which applies by its terms to childhood sexual assault occurring on and after January 1, 2024.

### B. Plaintiffs' State Law Claims Are Timely Under § 340.11(a)(1)

43. Section 340.11(a)(1) provides that an action for recovery of damages suffered as a result of childhood sexual assault occurring before January 1, 2024, shall be commenced "within 22 years of the date the plaintiff attains the age of majority or within five years of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual assault, whichever period expires later."

44. Each Plaintiff's claims are timely under the five-year delayed-discovery prong of § 340.11(a)(1). As alleged in the Plaintiff-specific paragraphs below, no Plaintiff discovered, and no Plaintiff in the exercise of reasonable diligence could have discovered, that the psychological injuries he suffered after attaining the age of majority were caused by Domeniconi's childhood sexual assaults until the dates alleged as to each Plaintiff, each of which falls within five years of the filing of this Complaint.

45. Plaintiffs' delayed discovery was neither idiosyncratic nor a product of inattention. Rather, it was the foreseeable and intended consequence of the conduct alleged herein. Domeniconi selected as his victims minors in state custody whose liberty he controlled; conditioned those victims to understand that reporting his illegal and reprehensible behavior would be futile and that they would not be believed; that reporting him would result in probation violations and increased detention or transfer; and inflicted the abuse described below under the guise of lawful custodial procedures, like strip searches, urinalysis testing, and home visits, which he was authorized to perform by the County. Domeniconi made clear to each Plaintiff that the abuse was an ordinary and lawful exercise of official authority, rather than an assault causing injury. The County, in turn, discarded written grievances against Domeniconi, contained complaints "in-house," and warned those who reported his questionable behavior that they risked their careers should they pursue the reports, as alleged in Paragraphs 70 through 83.

46. In the alternative, and to the extent any Plaintiff is found to have discovered or reasonably should have discovered the causal connection at an earlier date, the applicable limitations period was tolled and Defendants are estopped from asserting it, for the reasons alleged in Paragraphs 56 through 59 below.

**C. Section 340.11(c) Does Not Bar Plaintiffs' Claims**

47. California Code of Civil Procedure § 340.11(c) provides that an action described in subparagraph (B) or (C) of paragraph (1) of subdivision (a) "shall not be commenced on or after the plaintiff's 40th birthday unless the person or entity knew or had reason to know, or was otherwise on notice, of any misconduct that creates a risk of childhood sexual assault by an employee, volunteer, representative, or agent, or the person or entity failed to take reasonable steps or to implement reasonable safeguards to avoid acts of childhood sexual assault."

48. Section 340.11(c) imposes no bar on Plaintiffs' claims. Each of the disjunctive conditions it describes is satisfied, and either alone suffices.

49. First, the County knew or had reason to know, and was otherwise on notice, of repeated misconduct by Domeniconi creating a risk of childhood sexual assault by an employee. As alleged in Paragraphs 70 through 83, the County's own contemporaneous written records establish

that: complaints of Domeniconi's abusive and sexualized conduct toward minor wards were made in writing beginning no later than May 1990; a written report that Domeniconi had grabbed and pinched a minor ward's buttocks was submitted in October 1991 to an Institution Supervisor to whom "an initial complaint of abusive behavior" had already been made; a Group Supervisor filed a written formal complaint in October 1991 concerning a sexually explicit remark Domeniconi directed to a minor ward; the Department's Institutional Director confirmed in writing in November 1991 that these complaints had been elevated to and considered by "the Institution Supervisors and the Deputy Chief"; a minor ward's written grievance concerning Domeniconi was adjudicated by Domeniconi himself; a staff member discovered Domeniconi alone in a minor's room hugging and kissing him in or about 2002, a matter a Department Director directed be handled "in-house"; the Sheriff's Office investigated a complaint of Domeniconi's boundary violations with a probationer by February 2002; the director of a residential treatment program reported in 2005-2006 that Domeniconi was falsely holding himself out as probationers' officer, removing them from the program, buying them clothes and cologne, and was warned off by Domeniconi's own supervisor; and a Deputy Probation Officer reported encountering Domeniconi late at night when Domeniconi was present at the home of a minor probationer not assigned to his supervision.

50. Second, and independently, the County failed to take reasonable steps and failed to implement reasonable safeguards to avoid acts of childhood sexual assault committed by its employees, and specifically, Domeniconi. As alleged in Paragraph 83, the County failed to investigate, failed to discipline, failed to restrict Domeniconi's access to minors, failed to report to law enforcement as required by California Penal Code § 11166, failed to train its supervisors on grooming and boundary violations, failed to maintain any functioning system for receiving and preserving ward grievances, and failed to implement basic custodial safeguards — monitored strip searches, restrictions on one-on-one isolation with minors, two-officer presence during observed urinalysis, and prohibitions on transporting probationers in personal vehicles — that were standard or reasonably required in juvenile justice facilities. It instead promoted Domeniconi and expanded his access to vulnerable children.

51. Third, the County's knowledge and its failures preceded and continued throughout the period of each Plaintiff's abuse, and are established by the County's own records, by the sworn testimony of its current and former employees, and by its own discovery responses and admissions in related proceedings.

52. To the extent any cause of action asserted herein rests on the County's vicarious liability under California Government Code § 815.2 for Domeniconi's own intentional acts, that cause of action is an action described in subparagraph (A) of paragraph (1) of subdivision (a) of § 340.11, to which 340.11(c) does not apply by its terms.

**D. Plaintiffs' Claims Under 42 U.S.C. § 1983 Are Timely**

53. Plaintiffs' claims under 42 U.S.C. § 1983 are timely. Federal courts adjudicating section 1983 claims borrow the forum state's statute of limitations for personal injury actions, together with the state's related tolling rules, but the accrual of a section 1983 claim is governed by federal law, under which a claim does not accrue until the plaintiff knows or has reason to know both of his injury and of its causal connection to the defendant's conduct.

54. As to the County, the essential factual predicate of Plaintiffs' section 1983 claims — that County officials had received decades of written and verbal complaints concerning Domeniconi; had suppressed, discarded, and concealed those complaints; had declined to investigate, discipline, restrict, or remove him; and had retained and promoted him with knowledge of the risk he posed to minors in County custody — was affirmatively concealed from Plaintiffs and from the public by the County itself, through the conduct alleged in Paragraphs 70 through 83, including the disposal of written ward grievances in the garbage; the containment "in-house" of the 2002 incident and the directive that staff not discuss it; the suppression of the Etchison report and the warning to Etchison that his accusations could cost a career; the threats of retaliation against reporting wards documented in the County's own 1991 records; and the statement to at least one reporting Plaintiff that he would "not be believed" and that Domeniconi was "in good standing." The County's own 1990 and 1991 written memoranda described in Paragraphs 71 through 74, and the other contemporaneous records described in Paragraphs 70 through 83, were at all relevant times within the County's exclusive possession and control and were not publicly available. Their existence was first revealed through

investigation in related litigation in January 2026. No Plaintiff could, in the exercise of reasonable diligence, have discovered them at any earlier time.

55. No Plaintiff knew, or in the exercise of reasonable diligence could have known, of the County's institutional knowledge, concealment, and ratification of Domeniconi's conduct until the recent disclosures alleged as to each Plaintiff below, each of which falls within the applicable limitations period. Plaintiffs' section 1983 claims against the County accordingly did not accrue until those disclosures. In the alternative, and to the extent any Plaintiff's section 1983 claim is found to have accrued at an earlier date, the limitations period was tolled by Defendants' fraudulent concealment of the facts alleged above, and Defendants are equitably estopped from asserting it, for the reasons alleged in Paragraphs 56 and 59.

56. In addition, any applicable limitations period was tolled during each Plaintiff's minority pursuant to California Code of Civil Procedure § 352(a), and is further tolled under the doctrines of equitable tolling and fraudulent concealment, based on Defendants' affirmative and deliberate concealment of Domeniconi's abuse, their active suppression of complaints, and the psychological coercion, threats, and conditioning Domeniconi inflicted on each Plaintiff beginning during his minority and continuing thereafter.

57. The limitations period borrowed for Plaintiffs' claims under 42 U.S.C. § 1983 is that of California Code of Civil Procedure § 335.1, California's general personal injury statute, subject to the federal accrual rule alleged in Paragraph 53 and to the tolling, concealment, and estoppel doctrines alleged in Paragraphs 54 through 59, including tolling during each Plaintiff's minority under California Code of Civil Procedure § 352(a). In the alternative, and to the extent the Court concludes that a claim-specific statute supplies the borrowed period for this class of injury, that statute is California Code of Civil Procedure § 340.11, under which each Plaintiff's claims are timely for the reasons stated in Paragraphs 41 through 52.

58. The requirements of California Code of Civil Procedure § 340.11(f), (i), and (l) — governing certificates of merit, the attachment of the duty to serve, and the fictitious designations of the defendants — are not statutes of limitation, are not conditions on the accrual of any federal claim,

and have no application to Plaintiffs' claims under 42 U.S.C. § 1983. Those claims borrow from California law only the limitations period and the state's related tolling rules.

**E. Equitable Estoppel**

59. Defendants are equitably estopped from asserting any limitations defense, including the age-based limitation of California Code of Civil Procedure § 340.11(c). Defendants' own conduct — including Domeniconi's explicit threats of filing probation violations against Plaintiffs, increased detention at juvenile hall, and retaliation against Plaintiffs if they reported, resisted, or disclosed the abuse; the County's disposal of written grievances by wards; the retaliation threats against reporting wards documented in the County's 1991 records; the containment "in-house" of the 2002 incident and the directive that staff not discuss it; the warning to Charles Etchison that his report could affect Domeniconi's career and lead to termination; and the statement to at least one Plaintiff who reported the abuse that he would "not be believed" and that Domeniconi was "in good standing" in the Probation Department — was intended to and did prevent Plaintiffs from reporting the abuse, from discovering the County's institutional knowledge and role, and from pursuing their claims earlier. Having procured Plaintiffs' silence and delay through threats, concealments, and suppression, Defendants may not rely on that delay to defeat Plaintiffs' claims.

**F. No Government Claim Presentation Required**

60. No government claim presentation was required as a condition of suit. California Code of Civil Procedure section 340.11(s) provides: "Notwithstanding any other law, including Chapter 1 of Part 3 of Division 3.6 of Title 1 of the Government Code (commencing with Section 900) and Chapter 2 of Part 3 of Division 3.6 of Title 1 of the Government Code (commencing with Section 910), a claim for damages described in paragraphs (1) to (3), inclusive, of subdivision (a), is not required to be presented to any government entity prior to the commencement of an action." Each cause of action asserted herein is a claim for damages described in paragraphs (1) to (3) of subdivision (a) of section 340.11. No government tort claim was therefore required, and the Government Claims Act presents no bar to any cause of action asserted herein.

**G. Compliance with Section 340.11's Certificate Requirement; Reservation**

61. Concurrently with this Complaint, Plaintiffs have submitted under seal, for the Court's *in camera* review, the certificates of merit specified in California Code of Civil Procedure § 340.11(g)(1) and (g)(2) as to each Plaintiff, and have moved for the finding contemplated by § 340.11(i). Plaintiffs do so without waiver of, and expressly reserving their position that under *Berk v. Choy*, 607 U.S. ___, No. 24-440 (Jan. 20, 2026), Federal Rules of Civil Procedure 8 and 4 displace the requirements of § 340.11(f) and (i) in this Court, and that those requirements accordingly do not apply to this action. Plaintiffs submit the certificates solely to avoid any argument of forfeiture and to preserve their claims in the event of remand or refiling.

## VI. FACTUAL ALLEGATIONS

### A. The County's Probation Enterprise and the Authority It Conferred

62. During the relevant periods — spanning from approximately the late 1980s through the early 2000s — the County of San Mateo operated and controlled a comprehensive juvenile probation enterprise, including custodial detention at Hillcrest Juvenile Hall and Camp Glenwood, as well as community-based supervision of juvenile probationers.

63. Pursuant to this enterprise, the County employed Deputy Probation Officers ("DPOs") and vested them with extraordinary coercive authority over juvenile probationers, including authority to:

a. Compel minors to submit to supervised urine analysis testing, including direct observation of urination;

b. Conduct strip searches, including searches requiring probationers to disrobe, turn, bend over, spread their buttocks, squat, and cough;

c. Monitor and supervise probationers in showers, bedrooms, and other intimate settings within County facilities;

d. Initiate, recommend, or threaten probation violations, resulting in increased detention, extended sentences, or adverse placement changes;

e. Issue reports and recommendations directly bearing on a probationer's liberty; and

f. Access probationers in custodial and quasi-custodial settings, including their homes, schools, and vehicles.

64. The County knew or should have known that this combination of extraordinary coercive authority, intimate physical access, and custodial power over vulnerable minors created a foreseeable and serious risk that a DPO could exploit that authority to sexually abuse the children under his control. The risk was not merely foreseeable in the abstract — it materialized repeatedly over decades, and the County was on notice of it.

65. The abuse alleged herein occurred both inside and outside County custodial facilities. As alleged in the Plaintiff-specific paragraphs below, Domeniconi abused Plaintiffs during street encounters, traffic stops, transports in his personal vehicle, home visits, school visits, and other community contacts at times when those Plaintiffs were not detained in any County facility. Plaintiff John AV Doe was never a County probationer and was never in County custody. To the extent any Defendant contends that California Government Code section 844.6 immunizes the County from liability for injury to a "prisoner," that contention does not reach abuse inflicted outside custodial confinement, does not reach Plaintiffs' claims under 42 U.S.C. § 1983, and does not reach Plaintiffs' claims against the Individual Defendants. See Cal. Gov't Code § 844.6(d).

**B. John Domeniconi — A Predator Enabled by County Authority**

66. John Domeniconi was employed by the County as a Deputy Probation Officer for decades. He is deceased.

67. At all relevant times, deputy probation officers employed by the County were peace officers within the meaning of California Penal Code section 830.5, vested with authority to arrest, detain, search, and initiate probation violations. Domeniconi exercised that coercive law-enforcement authority in the course of each category of abuse alleged herein, and each act of abuse was accomplished by means of it rather than merely during it. See *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202.

68. Domeniconi systematically used the coercive machinery of the County's probation enterprise — particularly the power to compel strip searches, observe urination, and threaten probation violations — to sexually abuse juvenile male probationers. His pattern of conduct included, but was not limited to:

a. Conducting extended, unjustified strip searches in private, without legitimate penological purpose, during which he directed minors to remove clothing, turn, bend over, spread their buttocks, and touch parts of their own bodies;

b. Inserting fingers or his thumb into the anuses of minors during purported strip searches;

c. Grabbing, fondling, and otherwise touching the genitalia of minors during purported urine analysis testing, including pulling back foreskin and holding minors' penises during urination;

d. Masturbating while watching minors shower in County facilities;

e. Forcing minors to perform oral sex acts, using threats of probation violations and adverse reports as coercion;

f. Kissing minors on the mouth, pressing his body against theirs, and physically restraining minors in unwanted embraces;

g. Making explicit and threatening comments about minors' genitalia, sexual development, and vulnerability to sexual assault;

h. Grooming minors through gifts, food, preferential treatment, and expressions of affection, followed by escalating sexual abuse;

i. Threatening minors with probation violations, increased confinement, adverse custody outcomes, and retaliation if they reported his conduct or refused to comply; and

j. Accessing minors at their schools, residences, in his private vehicle, and at County-affiliated community programs, exploiting the psychological dominance he had established through custodial abuse.

69. Domeniconi's abuse was not incidental to his employment; it was accomplished *through* his employment. His imposed strip searches, urine tests, and custodial supervision were the vehicles of his abuse. His threats of filing probation violations for non-compliance were his instruments of coercion. The County's badge and authority were his means of access and silence.

//

**C. The County's Actual Knowledge and Suppression of Complaints**

70. The County did not fail to prevent Domeniconi's abuse for want of information. From no later than 1990 forward, the County received a documented and accumulating series of written and verbal reports that Domeniconi was abusing, threatening, sexualizing, and grooming the minors in its custody. The County's response, in every instance, was to decline to investigate meaningfully, to decline to discipline, to decline to report, to suppress the complaint, and to return Domeniconi to duties affording him unsupervised and intimate access to children.

71. The County's written notice began no later than May 1990. On or about May 2, 1990, Group Supervisor Robert Juergens submitted a written memorandum captioned "Physical Abuse" to Senior Group Supervisor Cynthia Crowe-Urgo, reporting that on April 18, 1990, Domeniconi had shoved a minor ward with both hands, sending him backward several feet, and had then threatened the ward with a loss of privileges; that the same evening Domeniconi threatened to write a false incident report against another minor ward "in such a manner" as to have the ward transferred and to inflict "a week of dead time even if the incident did not warrant such action"; and that Juergens believed he was "being targeted by Domeniconi for the purpose of keeping me from notifying senior staff of the incidents." No adequate investigation was conducted, and no remedial action was taken.

72. On October 24, 1991, Domeniconi grabbed and then pinched the buttocks of a minor ward near the Nurse's Office of the County's juvenile facility, in the presence of another ward. On October 29, 1991, Group Supervisor Scott Urabe reported the incident in writing to Institution Supervisor John Crandall — to whom, per Urabe's memorandum, the "initial complaint of abusive behavior" concerning Domeniconi had already been made, and who had directed that matters of this nature be submitted to him. Urabe wrote that the report was warranted by "Domeniconi's past and current history involving incidents of this nature." No adequate investigation was conducted and no remedial action was taken.

73. On October 26, 1991, Group Supervisor Deborah Dempnock filed a written formal complaint with Senior Group Supervisors John Crandall and Don McCreadie, copied to Institutional Director Clarence Rolen, reporting that Domeniconi had made a sexually explicit and degrading

remark about her to a minor ward and had instructed the ward to repeat it to her. Dempnock demanded to be informed, in writing, of the action management took.

74. On November 2, 1991, Urabe reported to Crandall in writing that Domeniconi had threatened to retaliate against the reporting ward — telling the ward that anyone who said what they had said about him would have their "ass in a royal sling." On November 15, 1991, after Dempnock submitted a written follow-up demand, Institutional Director Rolen responded in writing that Domeniconi had denied the allegations and that, "[a]fter consultation with the Institution Supervisors and the Deputy Chief," the Department had "concluded that the information was insufficient to take formal disciplinary action." By the County's own written record, complaints of Domeniconi's abusive and sexualized conduct toward wards had reached the Deputy Chief level of the Probation Department by November 1991 — and the Department's response was to do nothing. Domeniconi was retained, and was thereafter promoted to Deputy Probation Officer.

75. The County's ward grievance system offered no protection. In June 1991, a minor ward at Camp Glenwood submitted a written grievance complaining of Domeniconi's punitive and threatening conduct. The Camp Glenwood grievance record shows that the ward's grievance was received, answered, and rejected by Domeniconi himself, who wrote that he hoped the ward did not think "that a grievance will hinder or intimidate my actions."

76. Throughout the 1990s and 2000s, multiple juvenile probationers — including one or more Plaintiffs — submitted written grievances and complaints to County staff and supervisors regarding Domeniconi's grooming behavior, boundary violations, and sexual misconduct. On information and belief, County staff disposed of written complaints in the garbage rather than processing, preserving, or investigating them. Probationers witnessed this disposal firsthand.

77. In or about 2002, County probation staff member Vielka McCarthy discovered Domeniconi alone with a minor probationer inside the minor's room in a unit at the County's Hillcrest juvenile facility, hugging and, on information and belief, kissing him. McCarthy reported the incident up the chain of command. Anthony Orzem, a Director of the Probation Department (now deceased), told staff that the matter was "being dealt with in-house" — through the Department — and directed at least one officer not to discuss the matter with Domeniconi. Domeniconi was placed off work while

the matter was handled internally, and was then returned to work with continued custodial access to minors.

78. By at least February 2002, the County was aware of at least one formal complaint of boundary violations and inappropriate conduct by Domeniconi with a probationer, which had been referred to and investigated by the County of San Mateo Sheriff's Office. The County took no adequate remedial action following this investigation, and allowed Domeniconi to continue in roles that provided him access to minors.

79. In or about the year 2010, Charles Etchison, the founder and director of the Jericho Project, a residential treatment program serving County probationers, telephoned the Probation Department to report Domeniconi's conduct: that Domeniconi had repeatedly appeared at the program; had represented himself as the current probation officer of program participants when he was not; had taken participants — his former juvenile probationers — out of the program for meals and shopping trips; and had bought them clothes, cologne, and other personal items. Etchison's call was transferred to Domeniconi's supervisor, Defendant Doe 8. Etchison told Doe 8 that "there is something definitely wrong here," that the conduct was not typical of a probation officer, and that it had to be investigated. Doe 8 responded by warning Etchison that he was making accusations that could affect someone's career and could lead to termination. No investigation followed.

80. In or about the 2000s, Deputy Probation Officer Michael Klingler reported to his unit supervisor that he had encountered Domeniconi, late at night, at the home of a minor probationer to whom Domeniconi was not assigned, and that Domeniconi had escalated the encounter to the point that he was nearly arrested. The supervisor shook his head and said he would follow up. On information and belief, no investigation followed.

81. On information and belief, supervisory personnel within the County Probation Department — including Institution Supervisor John Crandall; Chief Probation Officer Loren Buddress (now deceased); Assistant Chief Probation Officer Stewart Peterson (now deceased); Director Anthony Orzem (now deceased); and each of the Individual Defendants — were directly informed, on multiple occasions prior to and during the period of each Plaintiff's abuse, of specific

complaints alleging inappropriate sexualized conduct, boundary violations, and sexual abuse by Domeniconi.

82. The year-by-year identities of Domeniconi's supervisors, the routing and disposition of complaints against him, and his personnel and assignment records are exclusively within the County's possession and control. When required in related litigation to identify the persons with the ability to supervise Domeniconi for each year of his employment, the County's designated representative could not do so with any certainty. Plaintiffs' allegations made on information and belief are accordingly based on the County's own contemporaneous records, the sworn testimony of current and former County employees, and the County's own discovery responses and admissions in other litigation.

83. Despite this accumulating and irrefutable notice, the County:

a. Failed to adequately investigate complaints against Domeniconi;

b. Failed to discipline, restrict, or remove Domeniconi from positions of unsupervised access to juvenile probationers;

c. Failed to implement safeguards — including monitored strip searches, restrictions on one-on-one isolation with minors, mandatory two-officer presence during observed urine testing, and prohibitions on Deputy Probation Officers transporting probationers in personal vehicles — that were standard or reasonably required in comparable juvenile justice facilities;

d. Failed to train supervisory staff on mandatory reporting obligations, professional boundary requirements, recognition of grooming behavior, or protocols for receiving, investigating, and escalating complaints of staff sexual misconduct;

e. Failed to report suspected child abuse to law enforcement as required by California Penal Code § 11166 et seq.;

f. Told at least one Plaintiff who reported Domeniconi's abuse that he would "not be believed" and that Domeniconi was "in good standing" — an affirmative act of suppression that silenced reporting and enabled continued abuse;

g. Promoted Domeniconi notwithstanding actual knowledge of complaints and warning signs, thereby ratifying his conduct and conferring additional institutional legitimacy that facilitated further abuse; and

h. Continued to assign Domeniconi duties that provided unsupervised, intimate access to juvenile male probationers, with full knowledge of the risk he posed.

84. The County's conduct constituted a *de facto* policy of deliberate indifference to the constitutional rights of juvenile probationers in its custody and care. This policy was the moving force behind the deprivation of each Plaintiff's constitutional rights.

85. On information and belief, the unconstitutional policies, customs, and practices described herein were known to, authorized, ratified, or implemented by officials with final policymaking authority within the County's Probation Department and County government, including but not limited to the Chief Probation Officer and other senior supervisory and managerial personnel.

**D. Color of Law**

86. At all relevant times, Domeniconi and the Doe Defendants acted under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of California and the County of San Mateo, within the meaning of 42 U.S.C. § 1983.

87. Domeniconi's sexual abuse was accomplished *by virtue of* — not merely *during* — his exercise of state authority. His badge, his official duties, his power to initiate probation violations, and his authority to conduct strip searches and urine tests were not the backdrop of his abuse; they were the instrumentality of it. The abuse could not have occurred but for the authority the County granted him and the state machinery he wielded.

**E. Plaintiff-Specific Allegations**

88. Each Plaintiff was a minor male at the time of the primary abuse alleged herein, ranging from approximately ten to seventeen years of age during the relevant periods.

89. Each Plaintiff other than Plaintiff John AV Doe was under active probation supervision by the County's Probation Department at the time of the abuse alleged herein. Each Plaintiff was subject to the direct or de facto supervisory authority of John Domeniconi, whether or not Domeniconi was that Plaintiff's assigned probation officer.

90. Each Plaintiff was subjected to one or more of the categories of abusive conduct described in Paragraph 68, including unconstitutional strip searches, abusive urine testing, unwanted sexual touching, coercive threats, grooming, and/or forced sexual acts, all accomplished through Domeniconi's exercise or threatened exercise of his official authority.

91. Each Plaintiff was threatened with probation violations, increased detention, adverse reports, or retaliation if he reported Domeniconi's conduct, refused to comply, or disclosed the abuse to parents, guardians, or other authorities.

92. Each Plaintiff suffered, and continues to suffer, severe psychological, emotional, and physical harm as a direct and proximate result of the constitutional violations, sexual abuse, and institutional failures alleged herein, including but not limited to: post-traumatic stress disorder; depression; anxiety; distorted relationships with authority, particularly male authority figures; difficulty with trust and interpersonal relationships; sexual dysfunction; substance use; impaired educational and vocational development; lost earnings; and diminished quality of life.

93. The injuries and illnesses described in Paragraph 92 are ongoing and substantially permanent.

**A. JOHN AA3 DOE**

94. John AA3 Doe was placed on juvenile probation in County of San Mateo beginning in 1989, when he was sixteen years old. John AA3 Doe was sentenced to spend over ten weekends in Hillcrest Juvenile Hall after being found involved in drinking, vandalism, and spray painting.

95. John AA3 Doe met Domeniconi when he turned himself in for one of the weekends. Domeniconi, who at the time was employed by the County Probation Department, touched and fondled AA3 Doe's testicles and penis, skin to skin, under the guise of testing for hernias or searching for contraband.

96. John AA3 Doe recalls out of the twelve or thirteen weekends he served, Domeniconi touched him inappropriately at least seven separate times.

97. At the time, John AA3 Doe, a sixteen-year-old juvenile, felt confused about the touching of his genitals being part of a perceived "standard procedure." As a result, John AA3 Doe felt uncomfortable and describes his recollection of these experiences as unsettling.

98. John AA3 Doe never reported these incidents to anyone due to his confusion and embarrassment. These experiences, as well as, the intrusions of these memories, have caused John AA3 Doe significant emotional distress.

99. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John AA3 Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

100. John AA3 Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

101. John AA3 Doe has suffered, since attaining the age of majority, the shame, embarrassment and severe emotional distress described in Paragraph 100. Until on or about the summer of 2025, he did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults; he had understood the touching to have been a standard custodial procedure, as alleged in Paragraph 97. He first understood that causal connection in or about the summer of 2025, when he heard Domeniconi's name mentioned in connection with similar allegations in press coverage. He sat with the realization for several months before disclosing the abuse for the first time.

102. The causal connection was not reasonably discoverable earlier because of Domeniconi's threats of retaliation and intimidation towards John AA3 Doe. Domeniconi made it clear to him that "no one would believe him" and that he could make John AA3 Doe's life miserable. John AA3 Doe internalized those threats and remained silent until he could no longer do so. In addition, John AA3 Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

//

**B. JOHN AC2 DOE**

103. John AC2 Doe was first placed on probation around the age of fifteen.

104. At the age of fifteen, John AC2 Doe was ordered to confinement at Camp Glenwood for a term of eight months. He first met John Domeniconi during that stint.

105. During this period, Domeniconi began to ingratiate himself to John AC2 Doe. He would give him compliments and special treatment. During John AC2 Doe's time at Glenwood, Domeniconi asked him to help organize the camp's library, on an evening in 1992. Domeniconi and John AC2 Doe were alone. As John AC2 Doe placed books on shelves, Domeniconi approached him, and began rubbing his penis against John AC2 Doe's body.

106. The above event took place a second time just a few weeks later. The same series of events; Domeniconi asking John AC2 Doe to help organize the library in the evening, and Domeniconi rubbing his penis against John AC2 Doe's body while John AC2 Doe was powerless to stop him.

107. On one occasion, Domeniconi arrested John AC2 Doe, at his house, for allegedly stealing his father's car. Domeniconi took John AC2 Doe in his car, a black IROC coupe, up Edgewood Road to a secluded wooded area near the then-Cordilleras Mental Health Center. Domeniconi parked the vehicle, and began lecturing John AC2 Doe. Domeniconi then reached over, inserted his hand underneath John AC2 Doe's pants, and began masturbating him. John AC2 Doe was paralyzed and could not process what was happening to him. While this occurred, John AC2 Doe was handcuffed and had his seatbelt on.

108. While at Glenwood and Hillcrest, Domeniconi strip searched John AC2 Doe. During these strip searches, Domeniconi routinely would fondle John AC2 Doe's genitals. Even after John AC2 Doe was released back into the community and resumed living in his parents' home, Domeniconi would appear unannounced and perform invasive strip searches on John AC2 Doe. The inappropriate behavior occurred at least five times.

109. John AC2 Doe currently suffers from anger issues, has difficulty connecting with others, distrusts those around him, and finds it difficult to sleep at night. He repeatedly has flashbacks to the abuse and suffers from anxiety and repetitive thinking.

110. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John AC2 Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

111. John AC2 Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

112. John AC2 Doe has suffered, since attaining the age of majority, the anger, difficulty connecting with others, distrust, sleep disturbance, flashbacks and anxiety described in Paragraph 111. Although he had long understood that Domeniconi's conduct toward him was wrong, he did not understand, and in the exercise of reasonable diligence could not have understood, that those adult injuries were caused by Domeniconi's sexual assaults until early 2026, when he spoke with another survivor about similar experiences. Until that conversation John AC2 Doe had never spoken to anyone about the abuse.

113. For years, John AC2 Doe knew that Domeniconi's actions were uncalled for and inappropriate but was so ashamed and embarrassed by what Domeniconi did to him, that he did not realize the abuse was not his fault until that 2026 conversation. Domeniconi's entire modus operandi was to make John AC2 Doe feel like he was a bad person and to blame for all the negative things that happened in his life. John AC2 Doe also feared retaliation from Domeniconi if he ever revealed the abuse. In addition, John AC2 Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**C. JOHN AM2 DOE**

114. In or about the year 1995, at the age of sixteen, John AM2 Doe was caught shoplifting. He was arrested, spent two days in custody, and was placed on juvenile probation. This was "light probation" – in other words, John AM2 Doe was subject to very few conditions of probation.

115. John AM2 Doe first met Domeniconi in 1995, when he was actively on juvenile probation. Domeniconi was not his assigned probation officer.

116. John AM2 Doe was walking with friends around the Grand Avenue area of South San Francisco when he was approached by Domeniconi. Domeniconi jumped out of his car and yelled "don't run motherfuckers, or I will violate you." John AM2 Doe and his friends complied. Domeniconi then proceeded to physically search John AM2 Doe's groin area, lingering in that area until he eventually grabbed John AM2 Doe's penis. John AM2 Doe jumped and called Domeniconi out.

117. Immediately after making that statement, John AM2 Doe felt a very sharp pain in his abdomen. Domeniconi had delivered a strike blow with his fist to John AM2 Doe's kidney area. After striking John AM2 Doe, Domeniconi stated "shut the fuck up or I will violate you."

118. In the following months, John AM2 Doe would frequently see Domeniconi driving in the area. Fearing what could result from a confrontation with Domeniconi, John AM2 Doe would deliberately flee anytime the geography would allow him.

119. When John AM2 Doe was approximately seventeen years old, in 1996, Domeniconi was driving a white vehicle and spotted John AM2 Doe on Linden Avenue between Lux Street and California Avenue. He stopped the vehicle, and yelled at John AM2 Doe to freeze. Domeniconi screamed at John AM2 Doe, "you are definitely high right now. I know you are high."

120. John AM2 Doe was then handcuffed with his hands behind his back, placed in the vehicle and Domeniconi began to transport him. Domeniconi did not reveal during transport where he was taking John AM2 Doe. Instead he repeatedly told the youth, "shut the fuck up or I will violate you."

121. Domeniconi proceeded to drive north on Linden, in the opposite direction of John AM2 Doe's home and the Probation Department. Instead, Domeniconi drove towards Airport Blvd., eventually crossing Highway 101 along Oyster Point Blvd. John AM2 Doe recalls being transported past the restroom located in front of the pier, adjacent to the tackle shop, and instead to the restrooms located more isolated and adjacent to the marina.

//

122. John AM2 Doe observed that Domeniconi checked the restrooms for other occupants. Domeniconi then removed one of John AM2's handcuffs and directed John AM2 Doe to submit to a urinalysis screening. Domeniconi continually stared at his penis during the purported screening. John AM2 Doe remarked, "why do you keep staring at my dick?" Domeniconi replied "I have to make sure you don't have any phony piss" to which John AM2 Doe challenged "you rolled up on me! Why would I have piss on me?"

123. John AM2 Doe was eventually released by Domeniconi. After the fact John AM2 Doe realized that this interaction had been inappropriate because he had in fact consumed marijuana prior to getting screened, but no disciplinary actions resulted from this incident. John AM2 Doe's assigned probation officer never brought up the incident either.

124. On or about 1997, following the commission of an unrecalled offense, John AM2 Doe had been ordered by the Juvenile Court to serve sixty days in custody. His probation status was to be terminated upon completion, as he was approaching his eighteenth birthday. John AM2 Doe was housed in the B Unit of Hillcrest Juvenile Hall.

125. One day, while in the B Unit, John AM2 Doe spotted Domeniconi. John AM2 Doe turned away to avoid contact until he looked up briefly. Domeniconi turned around, noticed John AM2 Doe and then blew him a kiss.

126. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John AM2 Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

127. John AM2 Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

128. John AM2 Doe has suffered, since attaining the age of majority, the fear, mistrust of authority, self-blame and severe emotional distress described in Paragraph 127. He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults until 2023, when he read press coverage of the allegations against Domeniconi and suffered a panic attack. Memories he had suppressed for years returned, and he

understood for the first time that his adult symptoms were the consequence of what Domeniconi had done to him.

129. For years, John AM2 Doe lived in fear and mistrusted those who could feasibly help him, which resulted in negative consequences in his personal life. Both as a youth and as an adult, he rebelled against authority and blamed himself for the abuse. He did not disclose the abuse until learning of the allegations made by others because he was ashamed and feared what others would think of him. Domeniconi had conditioned him to believe that he was a criminal and that no one would believe him if he ever came forward. In addition, John AM2 Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**D. JOHN AT DOE**

130. John AT Doe first met Domeniconi in 1993, when he was fourteen years old. He had begun to hang out with a peer group that did not want to follow rules. John AT Doe, with their encouragement, ran away from home. He was arrested for law violations.

131. John AT Doe was first placed at Hillcrest Juvenile Hall, then transferred to Camp Glenwood B Unit. However, his contact with Domeniconi was limited to his time at Hillcrest.

132. On two separate occasions, John AT Doe was strip searched by Domeniconi at intake. On the first occasion, Domeniconi touched John AT Doe's penis and digitally penetrated his anus. John AT Doe reacted negatively. Domeniconi threatened him, and stated to John AT Doe that if he reacted again, he would send John AT Doe to administrative segregation, the equivalent of solitary confinement in Hillcrest. Domeniconi then interrogated John AT Doe about his gang involvement and threatened to spread a rumor that John AT Doe tried to kiss him.

133. When John AT Doe continued to protest, Domeniconi threatened to kill his mother and brother. Domeniconi told John AT Doe that if he said anything to implicate Domeniconi, that he would ruin him. John AT Doe was terrified of him.

134. On the second occasion, Domeniconi suspected that John AT Doe was in possession of drugs. Domeniconi pulled John AT Doe into a janitor's closet. Domeniconi pulled down his own pants and tried to press genitals against John AT Doe's bare body. John AT Doe attempted to defend himself by pushing Domeniconi away and using a broomstick, but Domeniconi overpowered him. Domeniconi was only deterred by hearing footsteps nearby. Domeniconi stopped, pulled up his pants, and allowed John AT Doe to return to his cell.

135. Domeniconi also exhibited strange behavior when not alone with John AT Doe. He once asked all the youth in John AT Doe's unit to remove their shirts when playing basketball. John AT Doe called Domeniconi a weirdo and accused him of being a child molester.

136. Domeniconi also digitally penetrated John AT Doe's anus on a third occasion, this time not even under the guise of a strip search. Domeniconi accused John AT Doe of stealing ping pong balls from the mop room. This assault also took place in the mop room. Domeniconi threatened John AT Doe and his family during the incident, grabbed John AT Doe's genitals, and stated, "I am the law – I can do anything."

137. The above incidents marked John AT Doe's adolescence and adulthood. Because of John AT Doe's membership in a gang, he felt reticent to mention to anyone that he had been abused by a male authority figure. He was also in fear that Domeniconi would spread rumors about him, and harm his family.

138. John AT Doe suffers from severe emotional distress as a result of being abused by Domeniconi. To this day, he exhibits symptoms of post-traumatic stress disorder, anxiety, and obsessive thoughts.

139. John AT Doe understood that his psychological injuries were caused by Domeniconi's abuse and came forward in 2026, after learning about the state court litigation filed against the County. He realized for the first time that he was not alone and knowing that Domeniconi was no longer alive and could not retaliate against him gave him the confidence to speak about being abused.

140. John AT Doe concealed the abuse because as a youth without a father figure, Domeniconi made it clear that his friends and network would view him as lesser if he came forward as a victim of sexual violence. John AT Doe carried that shame and embarrassment as an adult until he

could no longer. In addition, John AT Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**E. JOHN AV DOE**

141. John AV Doe encountered Domeniconi in or about 1993, when he was thirteen years old. John AV Doe was attending Our Lady of Mt. Carmel School in Redwood City. Around lunchtime, on a break from class, he was walking near Taco Bell and threw a burrito at a truck to impress his girlfriend.

142. County of San Mateo probation officers often spoke at the school, in part to caution students against using illicit drugs. Unbeknownst to John AV Doe, a probation officer was present near the campus that day.

143. At the precise moment, John AV Doe threw the burrito, Domeniconi spotted him. Domeniconi got out of his Black Chevy Camaro I-ROC and approached John AV Doe and demanded that John AV Doe approach him. Domeniconi was wearing a County of San Mateo Probation jacket and badge.

144. Domeniconi put John AV Doe against the car, patted him down, cuffed him in the front, placed him in the car, and then began driving. Throughout the initial drive Domeniconi repeatedly stated to John AV Doe, "you're in private school, you shouldn't be doing public school bullshit."

145. As they approached Interstate 280, Domeniconi asked John AV Doe if he wanted to go to jail or home. John AV Doe stated he wanted to go home. Domeniconi suddenly pulled off at a vista point and told John AV Doe, "since you want to go home, you have to do something for me." Domeniconi then parked the car.

//

//

146. Domeniconi began touching John AV Doe's private parts. For approximately twenty minutes Domeniconi stroked John AV Doe's penis. John AV Doe did not ejaculate. He was confused, scared, and did not know what to do.

147. Domeniconi then instructed John AV Doe to do the same to him in return. John AV Doe, under Domeniconi's instructions, began stroking Domeniconi's penis. All the while, John AV Doe was confused, scared, and to distract from the horror he was experiencing, fixed his attention on a sticker on the dashboard. While stroking Domeniconi's penis, John AV Doe did not avert his eyes away from the dashboard.

148. John AV Doe stroked Domeniconi's penis until Domeniconi ejaculated.

149. Domeniconi dropped John AV Doe back off at Taco Bell where he told him "you get home, but I'm watching you."

150. John AV Doe never spoke about this incident out of fear and embarrassment.

151. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John AV Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense and suffering of a defenseless and vulnerable minor.

152. John AV Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

153. John AV Doe has suffered, since attaining the age of majority, the shame, fear and severe emotional distress described in Paragraph 152. He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assault until 2026, when an acquaintance told him of Domeniconi's death and of the pending litigation concerning Domeniconi's conduct.

154. He remained silent because of the shame and torment the incident caused him. Though Domeniconi was not his probation officer, Domeniconi's kidnapping and abuse of him haunted John AV Doe for the rest of his childhood and his adult life. John AV Doe lived in fear that Domeniconi would appear again and attempt to hurt him. In addition, John AV Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and

concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**F. JOHN DD2 DOE**

155. On or about July 17, 1997 John DD2 Doe was adjudged a ward of the court and placed in the County of San Mateo Probation Department Court Drug Program. A condition of his probation was to submit to urinalysis.

156. John DD2 Doe's assigned probation officer, Sharon Maguire, was a woman. As a result, Domeniconi regularly conducted urinalysis testing of John DD2 Doe, which he understood to be department policy.

157. During these urinalysis testings, Domeniconi took John DD2 Doe to a bathroom and asked him to spread his legs so he could search him.

158. On or about October 23, 1998 John DD2 Doe was booked into Hillcrest Juvenile Hall, where he started a two-year probation period. Plaintiff John DD2 Doe was sixteen years old at the time.

159. When John DD2 Doe went through the intake process at Hillcrest Juvenile Hall, Domeniconi alleged that John DD2 Doe was in possession of illegal contraband, and subsequently strip searched him.

160. While detained at Hillcrest Juvenile Hall Domeniconi frequently strip searched John DD2 Doe without cause or reason. While conducting strip searches, Domeniconi would call John DD2 Doe "sweetie" or "cupcake."

161. On one occasion, multiple probation officers searched John DD2 Doe's home. All the officers left and Domeniconi stayed behind, claiming he had to search John DD2 Doe. He directed John DD2 Doe to the bathroom and told him he had to "show proof" that he was not concealing anything between his legs or in his anus.

162. John DD2 Doe did not report these incidents, for fear of retaliation from Domeniconi.

//

163. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John DD2 Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

164. John DD2 Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

165. John DD2 Doe has suffered, since attaining the age of majority, the nightmares, crying fits, avoidance of public restrooms and severe emotional distress described in Paragraphs 164 and 166. He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults until on or about March of 2025, when he learned of Domeniconi's death and of the accounts of other men Domeniconi had abused.

166. Until that date, John DD2 Doe did not connect his avoidance of public restrooms to what Domeniconi had done to him, and only upon learning that other men had been victimized did the psychological pain manifest itself through nightmares, crying fits, and other physical symptoms. John DD2 Doe feared retaliation by Domeniconi and did not disclose it because of the shame Domeniconi instilled in him. In addition, John DD2 Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**G. JOHN EC DOE**

167. John EC Doe was 12 years old when he was first admitted to Hillcrest Juvenile Hall.

168. John EC Doe first met Domeniconi in 1989 at age fourteen. Domeniconi was then the Group Supervisor at Camp Glenwood. John EC Doe had gotten in a fight with another probationer and was sent to the admin bench. John EC Doe was told by Domeniconi that he "was a smart ass and was lucky [he] was not being sent to Hillcrest Court Disciplinary." Domeniconi told John EC Doe that he was going to be "his special project."

169. During urinalysis testing, Domeniconi would hold John EC Doe's penis and rub his own penis on John EC Doe's back and anus.

170. At Camp Glenwood, Domeniconi would have minors come get evening snacks from the kitchen. John EC Doe's section would be called last, a curious coincidence, which inevitably left Domeniconi and John EC Doe alone together in the kitchen.

171. During those periods, Domeniconi inappropriately touched John EC Doe's genitals, and on several occasions, the abuse escalated to oral and anal sex.

172. As a direct and proximate result of sexual contact, seminal exchange occurred between Domeniconi and John EC Doe, in the mouth and anus of John EC Doe.

173. Such incidents occurred on several occasions with anal intercourse occurring only in the Camp Glenwood kitchen, but oral exchanges occurred in the administrative building as well.

174. John EC Doe's grandmother would visit him regularly on Sundays. On several occasions thereafter, Domeniconi would strip search EC Doe. Invariably, Domeniconi touched John EC Doe's penis and testicles. Domeniconi would make John EC Doe spread his butt cheeks and digitally penetrated John EC Doe's anus.

175. On or about November 23, 1989 (Thanksgiving Day) John EC Doe was 1 of 5 kids that did not receive a home pass. That night, John EC Doe was called to the administration building and then brought to the kitchen where Domeniconi kissed him on the mouth; Domeniconi smelled of alcohol. Domeniconi instructed John EC Doe to pull his pants down and bend over. Domeniconi grabbed John EC Doe's hips or lower back, said "this is going to hurt for a minute" and then raped John EC Doe. Again, Domeniconi threatened John EC Doe to not tell anyone.

176. On one occasion, Domeniconi forced John EC Doe to perform fellatio on him. Domeniconi also instructed John EC Doe not to tell anyone.

177. John EC Doe did not fully report Domeniconi's misconduct because he was afraid of retaliation. He knew that if he reported, Domeniconi had the power to ensure that John EC Doe would be committed to the California Youth Authority ("CYA"), which at the time was a state-run system for housing, educating, and treating serious youthful offenders – otherwise known as youth prison.

John EC Doe did once attempt to report his experiences to DPO Greg Olsen, but did not go into specifics about Domeniconi's actions.

178. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John EC Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

179. John EC Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

180. John EC Doe realized in 2023 that he was not alone, after hearing Domeniconi's name mentioned by other former County probationers. He had believed for decades that he was the only one Domeniconi had abused. He then read press coverage about the state court cases and understood that his psychological injuries were caused by Domeniconi's abuse.

181. Domeniconi repeatedly threatened John EC Doe with negative consequences if he disclosed the abuse, which John EC Doe internalized throughout the years. This conditioning resulted in John EC Doe keeping the abuse to himself until recently. In addition, John EC Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

### H. JOHN ER DOE

182. John ER Doe was first placed on juvenile probation in 1995, when he was twelve years old, and spent time in Hillcrest Juvenile Hall.

183. In 1998, when John ER Doe was fifteen years old, he returned to Hillcrest. John Domeniconi was the probation officer in charge of receiving and booking youths that day. Domeniconi strip searched John ER Doe, and watched him intently during the search.

184. Domeniconi ingratiated himself to John ER Doe when John ER Doe was assigned to a weekend work program for probationers. John ER Doe noticed that Domeniconi was overly friendly and familiar with some of the boys in the program.

185. After completing the weekend work program and returning to his community, John ER Doe attended Jefferson High School. Domeniconi began to show up at the school to randomly strip search John ER Doe. This happened several times when John ER Doe was sixteen years old. Once, Domeniconi took John ER Doe to an office and performed a strip search on him. During the search, Domeniconi fondled John ER Doe's genitals.

186. Later in the school year, John ER Doe transferred to Gateway High School. Typically, counselors at Gateway would use metal wands to scan students for contraband. When Domeniconi showed up, he did not follow the usual protocol – he insisted on patting down students, including John ER Doe. On one occasion, Domeniconi stuck his hands inside John ER Doe's pants pockets and rubbed John ER Doe's penis. John ER Doe was startled, and began calling Domeniconi names. This was done in public, and John ER Doe's peers taunted him. John ER Doe was traumatized.

187. That same day, John ER Doe was led to an isolated area in Gateway by other probation officers. John ER Doe believes this was retaliation directed by Domeniconi for having challenged his authority.

188. John ER Doe transferred to Thornton High School. Domeniconi continued to appear at random times to strip search John ER Doe.

189. John ER Doe did not report Domeniconi's abuse of him for fear of further retaliation and concern that he would not be believed, due to Domeniconi's status and authority.

190. Domeniconi's abuse of John ER Doe caused John ER Doe significant pain and suffering, and severe emotional distress. John ER Doe began to suffer from post-traumatic stress disorder, and began using drugs and alcohol to mask his pain.

191. John ER Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

192. John ER Doe has suffered, since attaining the age of majority, the post-traumatic stress disorder, substance dependence and severe emotional distress described in Paragraphs 190 and 191.

He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults until on or about October 2024, when he spoke with another victim about Domeniconi.

193. John ER Doe remained silent for years because Domeniconi threatened him repeatedly in his youth. He plunged himself into addiction because of the pain and embarrassment, and did not fully appreciate or understand the connection between his symptoms and the abuse until recently. In addition, John ER Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**I. JOHN JA DOE**

194. John JA Doe was first placed on juvenile probation in 1998, at the age of sixteen. He served around four months at Hillcrest Juvenile Hall. During that stint, Domeniconi performed his intake, and conducted a strip search of John JA Doe. Domeniconi touched his penis and fondled his crotch area during the strip search. John JA Doe was frightened and did not challenge Domeniconi.

195. Days later, in the evening, Domeniconi entered John JA Doe's room at Hillcrest and conducted another strip search. Domeniconi again fondled John JA Doe's genitals. This time, he ordered John JA Doe to bend over, turn around, and spread his buttocks. Domeniconi grabbed John JA Doe's buttocks and used a flashlight to inspect him. John JA Doe repeatedly assured Domeniconi that he did not have contraband. When Domeniconi was finished, he warned John JA Doe not to tell anyone, or else he would strip search John JA Doe again. John JA Doe did not report this incident either.

196. Domeniconi repeated this behavior a third time approximately three weeks after the second incident. Domeniconi appeared in John JA Doe's unit, located John JA Doe, and directed him towards the bathroom. Domeniconi strip searched him, and squeezed his penis. This time John JA

Doe verbalized his discomfort with the abuse, and Domeniconi responded, "this is my job, and it will be worse if you continue to resist." Domeniconi stopped once he heard someone approaching the unit.

197. After John JA Doe's release from custody, Domeniconi became his probation officer. Domeniconi continued his prior behavior. Domeniconi located John JA Doe in a park and conducted a pat down search of him, while squeezing John JA Doe's penis and touching his crotch area. Several of John JA Doe's friends witnessed the search, but could not see the genital contact because Domeniconi had pushed John JA Doe up against a wall.

198. Domeniconi's abuse of John JA Doe had profound negative impacts on him. He struggled in school, developed chemical dependencies to numb his pain, and had difficulty navigating interpersonal relationships, particularly romantic ones.

199. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John JA Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

200. John JA Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

201. John JA Doe has suffered, since attaining the age of majority, the shame, embarrassment and severe emotional distress described in Paragraph 200, including the recurring nightmares and impaired daily functioning described in Paragraph 202. He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults until on or about the fall of 2024, when speaking to a friend whom he had met while in juvenile hall.

202. John JA Doe did not connect the abuse to his psychological injuries until he understood that the nighttime incident referenced in Paragraph 195 triggered his recurring nightmares and affected his daily functioning. John JA Doe lived in constant fear that Domeniconi would retaliate against him if he ever disclosed the abuse. In addition, John JA Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and

promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**J. JOHN JS DOE**

203. John JS Doe first met Domeniconi at the age of seventeen, in 1999, when he was placed under the direct supervision of Domeniconi.

204. Shortly after their first meeting, Domeniconi hugged John JS Doe and kissed him on his forehead, neck, and cheek.

205. Domeniconi strip searched and administered urinalysis tests on John JS Doe multiple times. On multiple occasions, and with increasing frequency, Domeniconi would ask John JS Doe to pull down his pants to see if he had anything hidden in them. Domeniconi would then ask John JS Doe to turn around and show him again, to which Domeniconi would ask "what do you have in there?"

206. On multiple occasions, during strip searches and urinalysis testing, Domeniconi would reach out and touch John JS Doe's genitalia. Furthermore, if John JS Doe could not immediately pee, Domeniconi would want to hold his genitalia.

207. During a school dance, John JS Doe was sent to the school's administrative office for dancing in an inappropriate manner with a girl. Since John JS Doe was on probation, his school called Domeniconi. Domeniconi appeared at the dance, and took John JS Doe to Juvenile Hall.

208. Upon entering Juvenile Hall, Domeniconi instructed John JS Doe to pull his pants down, bend over, and cough. John JS Doe recalls that Domeniconi then took him to his cell and instructed him to pull down his pants and spread his cheeks again. At that point John JS Doe questioned why he had to do it again to which Domeniconi replied "I set the rules."

209. The following day Domeniconi told John JS Doe that the girl from school was pressing charges and that meant John JS Doe was going to prison for 5 years. John JS Doe felt terrified. Domeniconi then took John JS Doe to get ice cream and then drove him home, where upon arriving Domeniconi told John JS Doe's mother that he "gave him a good scare."

//

210. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John JS Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

211. John JS Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

212. John JS Doe learned that he was a victim in August 2023, when he read press coverage regarding the state court allegations against Domeniconi. He immediately felt anxious and suffered from an intrusive reaction where he vividly recalled Domeniconi's odor of alcohol and cologne.

213. John JS Doe did not connect his psychological symptoms to the abuse until that very moment. Domeniconi conditioned John JS Doe to believe that as an adult, he was in charge, and that John JS Doe could not challenge or complain about Domeniconi's behavior. The year of torture Domeniconi put him through informed every moment that followed. In addition, John JS Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**K. JOHN JS2 DOE**

214. John JS2 Doe grew up in an unstable household. Both his parents struggled to take care of themselves, and John JS2 was often left to fend for himself.

215. In 1995 or 1996, when he was 10 or 11, John JS2 Doe stole something from a construction site. He was sent to Juvenile Hall and placed on probation. Even though John JS2 Doe's assigned Probation Officer checked on him at school, he continued to get in trouble and often was ordered to serve detention time on weekends in Juvenile Hall.

216. Domeniconi was not John JS2 Doe's assigned probation officer. However, he was the officer usually conducting John JS2 Doe's urinalysis tests.

217. On multiple occasions, John JS2 Doe recalls he was nervous because "I was dirty" – meaning he would test positive for having drugs in his system. Domeniconi would grab John JS2 Doe's penis and testicles, he handcuffed John JS2 Doe telling him "he knew I had something."

218. On one occasion, because of the foregoing incidents, John JS2 Doe had an erection. John JS2 Doe felt terrible and ashamed of it.

219. Domeniconi told John JS2 Doe he was going to place him in CYA if he said anything.

220. John JS2 Doe ended up returning to Juvenile Hall at the age of fifteen, in 2000, until he was eighteen years old. John JS2 Doe was housed away from the other kids because he used to get into fights. Domeniconi frequently took John JS2 Doe to the admin bathroom and raped him. This occurred five or six separate times. Every time Domeniconi would remark, "don't say anything or you are going to CYA for life. No one will believe you."

221. These experiences made John JS2 Doe feel violated, unprotected, and alone. These experiences, as well as, the intrusions of these memories, have caused John JS2 Doe significant emotional distress. John JS2 Doe suffers from an inability to focus, panic attacks, and emotionality. He also reports high anxiety around his son's safety and mistrust of anyone who comes close to him.

222. As a direct and proximate result of John JS2 Doe's lived trauma, he has been trapped in an addictive cycle of substance abuse. The addiction helps to numb the feelings related to the sexual trauma and to manage the effects of the shame and embarrassment John JS2 Doe feels daily.

223. John JS2 Doe experienced adversity at home during childhood; his experiences outside of his home were traumatic too. During the time of his abuse, John JS2 Doe was unable to speak about the sexual abuse that John Domeniconi perpetrated on him. His environment was not supportive and not conducive to act as a buffer against his traumatic experiences.

224. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John JS2 Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

225. John JS2 Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

226. John JS2 Doe has suffered, since attaining the age of majority, the substance dependence, anxiety and severe emotional distress described in Paragraph 225. He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults until in or about the summer of 2025, when he learned about the pending litigation concerning Domeniconi. John JS2 Doe recently became a father and came forward in part because of the anxiety he feels about his son's safety.

227. In no small part because of the abuse he suffered, John JS2 Doe turned inward and numbed his pain with drugs. Domeniconi's threats and constant belittling served their purpose, as John JS2 Doe did not disclose until after Domeniconi died. In addition, John JS2 Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**L. JOHN JT DOE**

228. In or around 1995–1997, when Plaintiff John JT Doe was aged fifteen to seventeen, he was detained and periodically committed to Hillcrest and Camp Glenwood, juvenile detention facilities operated by Defendant County. During that time, Domeniconi was his probation officer. Domeniconi took an interest in him and rapidly began to sexually assault and molest John JT Doe.

229. During that same time, but when John JT Doe was not confined to any correctional institution, juvenile hall, or other collective facilities of restraint established for youthful offenders, Domeniconi sexually assaulted, abused, molested, and harassed John JT Doe.

230. Domeniconi achieved these aims by grooming John JT Doe. Domeniconi would routinely buy presents for John JT Doe and take him on shopping trips to Sears and out for fast food, particularly Wendy's. During these car trips in Domeniconi's green Toyota Tacoma with sheep skin seat covers, Domeniconi had John JT Doe trapped in his car. Domeniconi would rub John JT Doe's leg and penis while John JT Doe sat in the passenger seat.

231. On one occasion, John JT Doe jumped out of the car and ran to avoid further molestation.

232. On another occasion, Domeniconi tried to lure John JT Doe into his apartment in Castro Valley, and again John JT Doe ran to avoid further molestation.

233. While housed at Hillcrest and Camp Glenwood, Domeniconi repeatedly removed John JT Doe from his housing unit to strip search him for extended periods of time with no one else present and without explanation. During such strip searching, Domeniconi would have John JT Doe remove his clothing, face away from him, and drop, squat, and cough.

234. On several occasions, Domeniconi would stare provocatively at John JT Doe's penis and testicles for an extended period. Occasionally, Domeniconi would make comments to John JT Doe that he should come live with Domeniconi at his house. John JT Doe was also uncomfortable with non-consensual hugs and kisses from Domeniconi.

235. Plaintiff John JT Doe learned that complaints would not protect him or make the conduct stop. No advocate and no attorney were provided to John JT Doe for his protection.

236. Domeniconi's prurient conduct continued whenever he saw John JT Doe in the showers naked. Domeniconi would make inappropriate, harassing comments to John JT Doe. Domeniconi often stood in the showers without any real purpose, watching the boys shower, including John JT Doe, and with his hand in his pants, or touching himself in the corner. Plaintiff John JT Doe was afraid and embarrassed and ashamed.

237. John JT Doe suspected that Domeniconi was sometimes drunk and could sometimes smell alcohol on him.

238. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John JT Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

239. John JT Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

//

240. John JT Doe has suffered, since attaining the age of majority, the addiction, shame and severe emotional distress described in Paragraphs 239 and 241. He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults until 2023, when he learned of the pending litigation concerning Domeniconi and heard from other survivors that he was not alone — which contradicted Domeniconi's conditioning that no one would believe him.

241. From that date, John JT Doe understood that the constant cycle of addiction was his way of pushing down the shame and embarrassment he felt after being abused by Domeniconi. Beginning to discuss the abuse openly has empowered him to take control of his life for the first time since before the abuse happened to him. In addition, John JT Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**M. JOHN SL DOE**

242. John SL Doe was placed on juvenile probation beginning in 1994, when he was twelve or thirteen years old. He lacked a father figure in his life and grew up without positive male role models.

243. At age fourteen, John SL Doe was arrested and sent to Hillcrest Juvenile Hall. He first encountered Domeniconi in his housing unit. Domeniconi claimed he smelled marijuana on John SL Doe's person, took him to the bathroom, and strip searched him. Domeniconi fondled John SL's penis, instructed him to spread his buttocks, and digitally penetrated his anus. When John SL Doe questioned the search, Domeniconi threatened to send him to CYA if he told anyone about what he had done.

244. After this incident, Domeniconi conducted regular strip searches on John SL Doe. During the searches, Domeniconi grabbed John SL Doe's penis and testicles. These acts occurred at least twenty times. Additionally, on multiple occasions, Domeniconi digitally penetrated John SL

Doe's anus. Domeniconi again claimed that John SL Doe smelled like marijuana as a pretext for the foregoing strip searches.

245. Domeniconi would also enter the bathroom while John SL Doe was showering, and would observe him, while staring directly at John SL Doe's genitals.

246. When John SL Doe was a student at Peninsula High School, and on juvenile probation, Domeniconi administered to him urinalysis testing and patdown searches, wherein he would grab John SL Doe's genitals.

247. Domeniconi sexually touched, harassed, battered, assaulted, abused, and groped John SL Doe without consent. Nor could John SL Doe consent due to his age. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

248. John SL Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

249. John SL Doe connected his psychological injuries to the abuse in October 2024, after learning about the ongoing state court litigation related to Domeniconi. Reading about others that had spoken out regarding the abuse empowered him to come forward.

250. John SL Doe did not disclose the abuse because of the profound shame and embarrassment it caused him. He also did not connect the abuse to his symptoms until well into his adulthood. In addition, John SL Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**N. JOHN SR DOE**

251. In the summer of 1993, John SR Doe was approximately fourteen years old. He was sent to Camp Glenwood for a probation violation, where Domeniconi was Head Administrator.

252. At Camp Glenwood John SR Doe was placed in a dorm with a female officer supervising the unit. The female officer would constantly stare at his groin/butt area, as well as the private areas of other probationers. Domeniconi would come from the administrative office to monitor the boys taking showers and would also ogle John SR Doe's private area.

253. A week or two later, John SR Doe brought his concerns about the inappropriate behavior directly to Domeniconi, who stated "you're in jail - we can look at your ass if we want to."

254. Domeniconi later told the female probation officer what John SR Doe told him. She called John SR Doe to the dorm office and berated him, saying "I'm only doing my job, I don't care what you say because I stay paid anyways. I can refile on you." John SR Doe understood this statement to mean that she was threatening to kick him out of Camp Glenwood, which would mean that he would be sent instead to Hillcrest Juvenile Hall.

255. Approximately two weeks later, John SR Doe suffered from poison oak exposure around his eyes, arm, and groin area. John SR Doe was given a small container of cream to treat the rashes. After a few days, John SR Doe needed to get more cream from the administrative office. John SR Doe encountered Domeniconi alone in the office. Domeniconi told John SR Doe that Domeniconi needed to apply the cream because John SR Doe wasn't allowed to have the cream anymore.

256. Domeniconi began applying the cream to John SR Doe's face and arms and then told John SR Doe to pull down his pants and boxer briefs. Domeniconi applied the cream to his upper groin area, and some of it fell onto John SR Doe's penis and testicles. Domeniconi used that cream to rub the inside of John SR Doe's thighs.

257. While Domeniconi continued applying cream to John SR Doe's thighs, he suddenly stuck his finger inside John SR Doe's anus. This caused John SR Doe to jump back and pull up his underwear. John SR Doe recalls stating something along the lines "I got the rest." After the fact, John SR Doe realized that Domeniconi had not been wearing gloves.

258. As a direct result of this incident, upon returning to the dorm John SR Doe instructed the female officer that he wanted to go back to Hillcrest. John SR Doe was eventually taken back to Hillcrest as a Camp Glenwood "program failure."

//

259. Sometime after John SR Doe returned to Hillcrest, Domeniconi was transferred from Camp Glenwood to Hillcrest "because of allegations." At Hillcrest Domeniconi's rank was III, which meant he had seniority and worked in units or intake. Because of his position, Domeniconi was able to roam the facility unquestioned.

260. While at Hillcrest, Domeniconi would regularly walk into the shower area and 'monitor' the boys.

261. As a result of his negative interactions with Domeniconi at Camp Glenwood, John SR Doe learned to avoid Domeniconi while detained at Hillcrest. When it was shower time, John SR Doe would stay on the side of the shower area where he could not be seen. When John SR Doe had to be strip searched, he would request that another officer perform the search.

262. This strategy was not always successful. When probationers had scheduled visitors, Domeniconi would take them alone to their cell or bathroom for a strip search. Domeniconi would instruct John SR Doe to raise his testicles, pull back his foreskin, squat and cough, and at times grabbed John SR Doe's testicles. Domeniconi would conduct these strip searches although probationers were already being searched by probation officers immediately after visiting.

263. Domeniconi sexually touched, harassed, battered, assaulted, abused, digitally penetrated, and groped John SR Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

264. John SR Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

265. John SR Doe learned of the pending litigation concerning Domeniconi in March 2023 and sought counsel. He wanted to ensure that other youths who had suffered abuse learned that they were not alone.

266. John SR Doe did not connect the abuse to his psychological symptoms until on or about March 2023, when he learned in the course of treatment that his risk-seeking behavior was a direct trauma response. He was afraid of Domeniconi, and his fear caused him to mistrust others. That mistrust continues to this day. In addition, John SR Doe did not know, and in the exercise of

reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990 and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

**O. JOHN XH DOE**

267. John XH Doe was first placed in County of San Mateo Juvenile Probation beginning in 1992, when he was approximately sixteen years old. John XH Doe was at Camp Glenwood when he first met Domeniconi.

268. Domeniconi immediately showed prurient interest in John XH Doe. Shortly after beginning his stint at Glenwood, Domeniconi watched John XH Doe shower.

269. Domeniconi's behavior escalated. He began patting John XH Doe down after showers, when John XH Doe was naked. Domeniconi routinely touched John XH Doe's buttocks, grabbed his penis and testicles, and moved his foreskin.

270. Later, Domeniconi drove John XH Doe to the dentist, massaging his leg the whole time. Domeniconi put his hands in John XH Doe's pants and remarked "you don't want to go to CYA. If you run, it's another 365 +1."

271. En route to the dentist Domeniconi gave John XH Doe a "Jugs" magazine.

272. On the return trip from the dentist to Camp Glenwood, Domeniconi stopped at Hillcrest Juvenile Hall, where he made John XH Doe shower while Domeniconi watched. Domeniconi then took John XH Doe to Burger King in South San Francisco, and remained with John XH Doe until they returned to Camp Glenwood, at which point Domeniconi conducted a patdown search.

273. During that incident, Domeniconi threatened John XH Doe, remarking "don't tell no one what happened, no one's gonna believe you. You'll get more time for lying."

274. John XH Doe reported the incident to Probation Officers Graves and Hubble, who worked at Glenwood, yet the matter was never addressed.

//

275. Domeniconi ran the canteen and movie night at Camp Glenwood. On multiple occasions Domeniconi gave John XH Doe extra candy and snacks without charging him points.

276. On one occasion, Domeniconi caught John XH Doe smoking marijuana. He threatened to violate John XH Doe's probation if he ever told anyone about the abuse.

277. On several occasions, Domeniconi digitally sodomized John XH Doe. And once, Domeniconi forced John XH Doe to allow him to perform fellatio.

278. After John XH Doe was released from Camp Glenwood, he learned that Domeniconi would come to his school looking for him. John XH Doe began avoiding school just so he would not have to see Domeniconi.

279. Domeniconi sexually touched, harassed, battered, assaulted, abused, digitally penetrated, and groped John XH Doe without consent. The foregoing acts were committed for no other reason than to satisfy Domeniconi's own prurient sexual desires at the expense, suffering, and demise of vulnerable and defenseless minor probationers under his supervision.

280. John XH Doe suffers shame, embarrassment, and severe emotional distress to this day because of the abuse he suffered at the hands of Domeniconi.

281. John XH Doe has suffered, since attaining the age of majority, the shame, embarrassment and severe emotional distress described in Paragraph 280. He did not understand, and in the exercise of reasonable diligence could not have understood, that those injuries were caused by Domeniconi's sexual assaults until September 2023, when he learned of the pending litigation concerning Domeniconi and was stunned to realize that he was not alone.

282. John XH Doe had been told repeatedly by Domeniconi that no one would believe him if he disclosed the abuse. Domeniconi also threatened him with negative consequences as a child if he were to disclose. As a result, John XH Doe did not connect his psychological injuries to the abuse until the date alleged in Paragraph 281. In addition, John XH Doe did not know, and in the exercise of reasonable diligence could not have known, that the County had received, suppressed and concealed complaints concerning Domeniconi's conduct with minors, or that it had retained and promoted him with knowledge of that conduct, until on or about January 2026. The existence of the County's 1990

and 1991 written memoranda documenting complaints against Domeniconi, described in Paragraphs 71 through 74, was first revealed through investigation in related litigation at that time.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of 42 U.S.C. § 1983 — Fourth Amendment (Unreasonable Searches)**

*(Against Defendant County of San Mateo and the Individual Doe Defendants)*

283. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

284. The Fourth Amendment to the United States Constitution, made applicable to the states and their subdivisions through the Fourteenth Amendment, protects individuals against unreasonable searches of their persons. This protection applies to persons in state custody, including juvenile detainees and probationers subject to state supervision.

285. A search conducted for the purpose of sexual gratification serves no legitimate penological or supervisory purpose and is unreasonable under the Fourth Amendment regardless of the custodial setting. *Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001); *Byrd v. Maricopa County Sheriff's Department*, 629 F.3d 1135 (9th Cir. 2011) (en banc). The scope, manner, justification, and place of an intimate search must each be reasonable, and a search that is prolonged, repeated, conducted in isolation, and accompanied by sexual touching or penetration exceeds any legitimate justification.

286. Domeniconi's conduct — including conducting extended, repeated, unjustified strip searches in isolation; inserting fingers into minors' anuses; grabbing and fondling minors' genitalia during urine testing; grabbing minors' genitalia and causing them to ejaculate; and exposing himself to minors while masturbating — constituted egregious, objectively unreasonable searches with no legitimate governmental justification.

287. Each such search was conducted under color of state law, using the official authority conferred upon Domeniconi by the County, and constituted an unreasonable search in violation of the Fourth Amendment.

//

288. The County, through the policies, customs, practices, and deliberate indifference described herein, was the moving force behind these constitutional violations.

289. The Supervisory Defendants, Does 1 and Does 4-8, are liable in their individual capacities for implementing, authorizing, or knowingly acquiescing in the unconstitutional search practices, with deliberate indifference to the known risk of harm to Plaintiffs.

290. As a direct and proximate result of these constitutional violations, each Plaintiff suffered the damages described herein.

## SECOND CAUSE OF ACTION

**Violation of 42 U.S.C. § 1983 — Fourteenth Amendment (Substantive Due Process / Bodily Integrity)**

*(Against Defendant County of San Mateo and the Individual Defendants)*

291. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

292. The Fourteenth Amendment guarantees substantive due process, including the fundamental right to bodily integrity — the right to be free from state-imposed sexual abuse and sexual violence. This right is particularly acute for persons in the custody and care of the state, who cannot remove themselves from harm and who are uniquely dependent on the state for their safety and protection. *Youngberg v. Romeo*, 457 U.S. 307 (1982); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451–52 (5th Cir. 1994); *Plumeau v. School Dist. No. 40*, 130 F.3d 432 (9th Cir. 1997).

293. Domeniconi's sexual abuse of each Plaintiff — including forced sexual acts, abusive touching of genitalia, and sexual assault committed under color of and by means of official probation authority — constituted a profound and deliberate violation of each Plaintiff's right to bodily integrity, of a character "shocking to the conscience" within the meaning of *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

294. The County's sustained deliberate indifference to Domeniconi's known pattern of sexual abuse, its affirmative suppression of complaints, its promotion of Domeniconi notwithstanding notice of his conduct, and its failure to implement any meaningful safeguards constituted a policy and

practice that was the moving force behind the deprivation of each Plaintiff's substantive due process rights.

295. The Supervisory Defendants, Does 1 and Does 4-8, who had actual knowledge of Domeniconi's conduct and knowingly failed to intervene, are individually liable under *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011).

296. As a direct and proximate result of these constitutional violations, each Plaintiff suffered the damages described herein.

**THIRD CAUSE OF ACTION**

**Violation of 42 U.S.C. § 1983 — Fourteenth Amendment (Equal Protection)**

*(Against Defendant County of San Mateo and the Individual Defendants)*

297. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

298. The Fourteenth Amendment's Equal Protection Clause prohibits state actors from subjecting individuals to discriminatory treatment based on sex or gender.

299. Domeniconi's victims were uniformly young males. A substantial motivating factor in Domeniconi's selection and targeting of victims was the victims' sex. Domeniconi made explicit comments about Plaintiffs' male anatomy and deliberately selected male probationers as targets for sexual abuse based on their sex.

300. The County's failure to investigate, act upon, or remedy Domeniconi's known pattern of gender-targeted sexual abuse — including its promotion of Domeniconi and disposal of complaints — constituted deliberate indifference to gender-based discrimination, violating the Equal Protection rights of each Plaintiff.

301. As a direct and proximate result of these constitutional violations, each Plaintiff suffered the damages described herein.

**FOURTH CAUSE OF ACTION**

***Monell* Municipal Liability — 42 U.S.C. § 1983**

*(Against Defendant County of San Mateo)*

302. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

303. Defendant County of San Mateo is a municipality and public entity subject to liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for constitutional violations caused by its own policies, customs, and practices.

304. The County's liability is established on each of the following independent and overlapping Monell theories:

**Theory 1: Longstanding Custom and Practice of Deliberate Indifference**

305. The County maintained a longstanding, widespread, and well-settled *de facto* custom and practice of ignoring, suppressing, and failing to investigate or act upon complaints of sexual misconduct by Domeniconi and, on information and belief, other Probation Department personnel. This custom was so persistent and widespread as to constitute a standard operating procedure that effectively endorsed the unconstitutional conduct. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

306. Specifically, the County's custom and practice included: disposing of probationers' written grievances without review; discrediting complainants; affirmatively representing to abuse victims that their complaints would not be credited; retaining Domeniconi and other misconduct-prone DPOs in positions of custodial access; and failing to refer complaints to law enforcement or child protective services.

**Theory 2: Failure to Train and Supervise with Deliberate Indifference**

307. The County maintained a policy or custom of failing to adequately train supervisory personnel on: (a) recognizing the warning signs of grooming and sexual abuse by staff; (b) mandatory reporting obligations under Penal Code § 11166 et seq.; (c) proper procedures for conducting, monitoring, and documenting strip searches and urine testing; (d) protocols for receiving, investigating, and escalating complaints of staff sexual misconduct; and (e) policies prohibiting isolation of minors with individual staff members. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

308. The need for such training was plainly obvious given the nature of juvenile probation work and the County's actual notice of Domeniconi's conduct. The County's failure to train amounted

to deliberate indifference to the constitutional rights of juvenile probationers. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

**Theory 3: Ratification by Final Policymakers**

309. Officials with final policymaking authority within the County's Probation Department — including, on information and belief, the Chief Probation Officer and senior administrative officials — had actual knowledge of Domeniconi's misconduct and affirmatively ratified it through continued employment, promotion, and continued assignment of unsupervised access to minors. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999).

310. In particular, Loren Buddress, now deceased, was Chief Probation Officer during much of the relevant period and a final policymaker; his decisions to retain, promote, and protect Domeniconi despite actual knowledge of complaints constitute ratification attributable to the County.

311. The decision to promote Domeniconi, made with actual or constructive knowledge of complaints against him, constitutes the clearest possible evidence of ratification: a final policymaker deliberately chose to elevate a known abuser rather than remove him. That ratification became the moving force behind the continuation of Domeniconi's abuse.

**Theory 4: Deliberately Indifferent Policy of Inadequate Safeguards**

312. The County failed to implement any meaningful structural safeguards to prevent the foreseeable abuse of minors by Probation Officers, including: prohibitions on one-on-one strip searches; requirements that strip searches be conducted with two officers present or with contemporaneous documentation; meaningful oversight of urine testing procedures; restrictions on DPOs taking probationers in private vehicles; and complaint systems accessible to and protective of juvenile probationers. The failure to implement these basic safeguards, in the face of obvious need and actual notice, constitutes deliberate indifference amounting to an unconstitutional policy. *Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002).

313. Each of the foregoing policies, customs, and practices was the moving force behind the deprivation of Plaintiffs' Fourth and Fourteenth Amendment rights. *City of Canton*, 489 U.S. at 389.

314. As a direct and proximate result of the County's unconstitutional policies, customs, practices, and deliberate indifference, each Plaintiff suffered the damages described herein.

**FIFTH CAUSE OF ACTION**

**Violation of the Bane Act (California Civil Code § 52.1)**

*(Against Defendant County of San Mateo and the Individual Defendants)*

315. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

316. California Civil Code § 52.1(c) provides a private right of action for interference with state or federal civil rights by threats, intimidation, or coercion.

317. Domeniconi, acting within the course and scope of his employment with the County, knowingly and intentionally interfered with each Plaintiff's rights to bodily integrity, personal security, privacy, and freedom from official coercion and sexual violence under the Fourth and Fourteenth Amendments and California law, through violence, sexual abuse, and — separately and independently — through threats of probation violations, increased detention, adverse reports, and retaliation for reporting.

318. The coercive threats were independent of and in addition to the sexual touching itself, satisfying the "threats, intimidation, or coercion" requirement of section 52.1. *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004); *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 801–03 (2017).

319. The Supervisory Defendants, Does 1 and Does 4-8, acting within the course and scope of their employment, further interfered with Plaintiffs' rights through affirmative suppression of complaints, intimidation of reporting victims, and institutional inaction amounting to deliberate indifference and ratification.

320. The County is vicariously liable for Bane Act violations committed by its employees, including Domeniconi and Does 1 through 8 under Government Code section 815.2.

321. Plaintiffs seek all relief available for a violation of California Civil Code section 52.1, including actual damages, exemplary damages, the statutory civil penalty, and attorney's fees and costs, pursuant to Civil Code sections 52.1(c), 52.1(i), and 52(b). Plaintiffs do not seek punitive or exemplary damages against the County. See Cal. Gov't Code § 818. Exemplary damages under Civil

Code section 52(b)(1) are sought against the Individual Defendants, Does 1 through 8, in their personal capacities only.

**SIXTH CAUSE OF ACTION**

**Sexual Battery (California Civil Code § 1708.5; Government Code § 815.2)**

(*Against Defendant County of San Mateo*)

322. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

323. Domeniconi, acting within the course and scope of his employment with the County, intentionally committed acts intended to, and that did, cause harmful and offensive contact with the sexual organs, anus, groin, and/or buttocks of each Plaintiff — including, but not limited to, abusive strip searches, genital touching during urine tests, forced oral sex, digital penetration, and pressing his body against Plaintiffs' — in a manner that would offend a reasonable sense of personal dignity.

324. Plaintiffs did not and could not give meaningful consent to any such acts, given Domeniconi's custodial authority, the coercion inherent in the threat of probation violations, and each Plaintiff's youth, vulnerability, and confinement.

325. The County is vicariously liable under Government Code § 815.2.

326. As a direct and proximate result, each Plaintiff suffered the damages described herein.

**SEVENTH CAUSE OF ACTION**

**Battery (Common Law; Government Code § 815.2)**

(*Against Defendant County of San Mateo*)

327. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

328. To the extent this cause of action is not subsumed by Civil Code section 1708.5, Domeniconi, acting within the course and scope of his employment, intentionally committed acts resulting in harmful or offensive contact with each Plaintiff, including non-consensual touching that would offend a reasonable sense of personal dignity.

329. The County is vicariously liable for Domeniconi's offensive touching of Plaintiffs under Government Code § 815.2.

330. As a direct and proximate result, each Plaintiff suffered the damages described herein.

**<u>EIGHTH CAUSE OF ACTION</u>**

**Intentional Infliction of Emotional Distress (Government Code § 815.2)**

(*Against Defendant County of San Mateo and the Individual Defendants*)

331. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

332. The conduct of Domeniconi and the Individual Defendants, as described herein, was extreme and outrageous, exceeding all bounds tolerated in a civilized society, and was intended to cause or carried out with reckless disregard of the probability that it would cause each Plaintiff to suffer severe emotional distress.

333. The County's employees' knowing promotion of a serial child abuser while suppressing the complaints of his victims constitutes outrageous conduct, independent of Domeniconi's direct abuse.

334. As a direct and proximate result of this conduct, each Plaintiff suffered severe and continuing emotional distress, including the injuries and illnesses described in Paragraph 92.

335. The County is vicariously liable under Government Code § 815.2. Punitive damages are sought against the Individual Defendants only. See Cal. Gov't Code § 818.

**<u>NINTH CAUSE OF ACTION</u>**

**Negligence (Government Code § 815.2)**

*(Against Defendant County of San Mateo and the Individual Defendants)*

336. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

337. Domeniconi, the Individual Defendants, and Domeniconi's supervisors owed each Plaintiff a special duty of care arising from the custodial and supervisory relationship between County Probation Officers and juvenile probationers. This duty encompassed the obligation to use reasonable care to protect probationers from harm, including harm by other County employees with custodial access.

338. Defendants breached this duty through the acts and omissions described herein, including failures to investigate complaints, failures to supervise, failures to implement safeguards, affirmative suppression of complaints, and promotion of a known abuser.

339. These breaches were a substantial factor in causing each Plaintiff's harm.

340. The County is vicariously liable under Government Code § 815.2 for the negligent acts and omissions of its employees acting within the course and scope of employment.

**TENTH CAUSE OF ACTION**

**Negligent Hiring, Supervision, and Retention**

*(Against Defendant County of San Mateo and the Individual Defendants)*

341. Plaintiffs re-allege and incorporate by reference each and every allegation above as though fully set forth herein.

342. This cause of action is brought against the Individual Defendants in their individual and supervisory capacities, as those persons responsible for the hiring, training, supervision, discipline, and retention of Domeniconi and other probation department personnel.

343. The Individual Defendants knew or should have known — as early as 1990 and with accumulating certainty thereafter — that Domeniconi posed a foreseeable and serious risk of sexual harm to juvenile probationers.

344. Despite this knowledge, the Individual Defendants failed to take reasonable steps to restrict, discipline, remove, or report Domeniconi, and instead promoted him and continued to assign him unsupervised access to vulnerable minors.

345. These failures were a substantial factor in causing each Plaintiff's harm.

346. The County's liability is asserted under Government Code § 815.2 and to the extent authorized by statute.

## VIII. DAMAGES

347. As a direct and proximate result of all Defendants' conduct, each Plaintiff has suffered and continues to suffer damages including:

a. **Non-economic damages:** Severe and permanent psychological injury; post-traumatic stress disorder; depression; anxiety; shame; humiliation; loss of self-esteem;

loss of enjoyment of life; flashbacks and intrusive thoughts; difficulty sleeping; and impaired relationships with others, particularly male authority figures;

b. **Economic damages:** Past and future lost earnings and earning capacity; loss of educational and professional development opportunities; and past and future costs of medical, psychological, and psychiatric treatment and counseling;

c. **Statutory and enhanced damages**, including exemplary damages and the statutory civil penalty under California Civil Code section 52(b), and treble damages under California Code of Civil Procedure section 340.11(b) against the Individual Defendants found to have covered up the childhood sexual assault of a minor; and

d. **Attorney's fees** pursuant to 42 U.S.C. § 1988(b), California Civil Code sections 52(b)(3) and 52.1(i), and other applicable law.

348. Plaintiffs do not seek punitive or exemplary damages against the County of San Mateo. See Cal. Gov't Code § 818. Punitive and exemplary damages are sought against the Individual Defendants, in their personal capacities only, to the extent permitted by law.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For compensatory damages — past, present, and future, economic and non-economic — in amounts to be determined at trial;

2. For statutory and enhanced damages, including exemplary damages and the statutory civil penalty under California Civil Code section 52(b), and treble damages under California Code of Civil Procedure section 340.11(b) against the Individual Defendants found to have covered up the childhood sexual assault of a minor;

3. For exemplary and punitive damages against the Individual Defendants pursuant to California Civil Code section 52(b)(1) and 42 U.S.C. § 1983, in amounts sufficient to punish and deter the conduct alleged herein;

4. For reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b) and California Civil Code sections 52(b)(3) and 52.1(i);

5. For costs of suit;

6. For pre-judgment and post-judgment interest as permitted by law; and

7. For such other and further relief as this Court deems just and proper.

Dated: September 30, 2026

**GOETHALS & STONE, PC**

By: /s/ David G. Hollenberg
JOSEPH M. GOETHALS
CHARLES P. STONE
DAVID G. HOLLENBERG
*Attorneys for Plaintiffs*

## X. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: September 30, 2026

**GOETHALS & STONE, PC**

By: /s/ David G. Hollenberg
JOSEPH M. GOETHALS
CHARLES P. STONE
DAVID G. HOLLENBERG
*Attorneys for Plaintiffs*